CASE NO. 21-3195

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

WENDY L. PAINTER,

Plaintiff-Appellant,

v.

MIDWEST HEALTH, INC.
And PIONEER RIDGE NURSING
FACILITY OPERATIONS, LLC,

Defendants-Appellees.

---

On Appeal from the United States District Court
For the District of Kansas

The Honorable Daniel D. Crabtree
United States District Judge
Case No. 2:19-CV-02336-DDC

---

**APPELLANT'S OPENING BRIEF**

---

Respectfully Submitted,

Theodore J. Lickteig
Kan. Bar No. 12977
Law Offices of Theodore J. Lickteig
12760 W. 87th Street, Suite 112
Lenexa, Kansas 66215-2878
tjllawoffice@planetkc.com
913-894-1090
*Attorney for Wendy L. Painter*

ORAL ARGUMENT REQUESTED

TABLE OF CONTENTS

Prior or Related Appeals ……………………………………………………. vi

Statement of Jurisdiction ……………………………………………………..  1

Statement of the Issues ………………………………………………………  1

Argument ……………………………………………………………………  5

     I.     **Painter presented sufficient disputes of material fact to clear the motion for summary judgment on the question of whether Pioneer Ridge Nursing Facility discriminated against Painter on the basis of race in violation of Title VII and Section 1981**…………………………………………  5

     II.    **Painter presented sufficient disputes of material fact to clear the motion for summary judgment on the question of whether Pioneer Ridge Nursing Facility retaliated against Painter for making reports of race discrimination in violation of Title VII and Section 1981 when she was re-assigned to the rapid recovery unit or when she was terminated, or both**……………………………………….. 15

     III.    **Painter presented sufficient disputes of material fact to clear the motion for summary judgment to show Pioneer Ridge Nursing Facility tortiously interfered with Painter's prospective contractual relationships or expectancies in the form of employment with other nursing facilities**…………………………….………………………… 19

     IV.    **This panel should consider overruling *Anderson v. United Tel Co. of Kan.*, 933 F.2d 1500 (10th Cir. 1991) or should certify questions to the Kansas Supreme Court to address the viability of Painter's claim that Pioneer Ridge Nursing Facility blacklisted Painter in violation of K.S.A. 44-117 and 44-119 when it reported Painter to the Kansas Department of Aging and Disability Services for alleged abuse**……………………………………………..23

i

Conclusion …………………………………………………………………. 32

Statement Regarding Oral Argument ………………………………………… 32

Certificate of Compliance …………………………………………………….. 32

Certificate of Digital Submission …………………………………………….... 33

Certificate of Service …………………………………………………….….. 33

Attachments:

Memorandum and Order, September 28, 2021.

Judgment, September 28, 2021.

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Coors Brewing Co.,* 181 F.3d 1171 (10th Cir. 1999)……………… 17

*Anderson v. United Tel. Co.,* 933 F.2d 1500 (10th Cir. 1991)……………24, 25, 31

*Argo v. Blue Cross and Blue Shield of Kanas, Inc.,* 452 F.3d 1193
 (10th Cir. 2006)……………………………………………………………. 7, 8

*Bostock v. Clayton County, Georgia,* 140 S.Ct. 1731 (2020)…………………7, 29

*Braxton v. Nortek Air Solutions, LLC,* 769 Fed.App. 600 (10th Cir. 2019)………10

*Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 77 P.3d 130 (2003)…………..22

*Burlington Indus, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257,
 141 L.Ed.2d 633 (1998)……………………………………………………10

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)…………………16

*Cohen v. Battaglia*, 296 Kan. 542, 293 P.3d 752 (2013)………………………… 22

*Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642 (10th Cir. 2013)……… 14

*DePaula v. Easter Seals El Mirador,* 859 F.3d 957 (10th Cir. 2017)……6, 15, 19, 23

*Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299 (10th Cir. 2017)…………… 14

*Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 872 P.2d 252 (1994)……… 20

*Ewing v. TWA Restaurant Group, Inc.,* No. 08-2024-CM (D. Kan.
 March 12, 2009)…………………………………………………………… 7

*Hinds v. Sprint/United Management Co.,* 523 F.3d 1187 (10th Cir. 2008)………. 17

*Jill D. Rowland v. U.S.A. 800, Inc.*, Case No. 14-CV-12 (Feb. 17, 2015)……….. 25

*McCowan v. All Star Maint., Inc.,* 273 F.3d 917 (10th Cir. 2001)…………………7

*McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 96 S.Ct. 2574,
49 L.Ed.2d 493 (1976)…………………………………………………………………8

*McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817,
36 L.Ed.2d 668 (1973)………………………………………………………… 11

*McGarry v. Board of Count Comm'rs of County of Pitkin,* 175 F.3d 1193
(10th Cir. 1999)………………………………………………………………... 7

*Mitchell v. City of Wichita, Kansas,* 140 Fed.App. 767 (10th Cir. 2005)………….11

*Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997)………………………13

*New Prime, Inc. v. Oliveira*, 139 S.Ct. 532, 202 L.Ed.2d 536 (2019)……………. 29

*Notari v. Denver Water Dept.,* 971 F.2d 585 (10th Cir. 1992)…………………….. 7

*Plotke v. White,* 405 F.3d 1092 (10th Cir. 2005) ……..…………………………7, 13

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct.
2097 (2000)…………………………………………………………………7, 13

*Squires v. City of Salina*, 9 Kan. App. 2d 199, 675 P.2d 926 (1984)…………….. 28

*Swackhammer v. Sprint/United Management Co.,*493 F.3d 1160 (10th Cir. 2007). 13

*Tcherepnin v. Knight*, 389 U.S. 332, 88 S. Ct. 548, 19 L. Ed. 2d 564 (1967)…… 28

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)…………………… 12

*Tolan v. Cotton,* 134 U.S. 1861 (2014)………………………………………… 14

*Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106 (1986)………………….. 20

*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987 (10th Cir. 2011)………………16

*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079 (10th Cir. 2007)……………. 16

**Statutes**

28 U.S.C. § 1331………………………………………………………………… 1

28 U.S.C. § 1367………………………………………………………………… 1

42 U.S.C. § 1981……………………………………………………………1, 3, 15

K.S.A. 44-117…………………………………………………………………3, 24

K.S.A. 44-119………………………………………………………………...3, 24, 25

K.S.A. 44-119a……………………………………………………………….26, 28

**Rules**

Fed. R. App. P. 4(a)(1)(A)………………………………………………………… 1

**Other**

BLACK'S LAW DICTIONARY, 1st ed. 553 (1891). …………………………………… 26

BLACK'S LAW DICTIONARY, 5th ed. 637 (1979)…………………………………… 26

BLACK'S LAW DICTIONARY, 9th Ed. 727 (2004). …………………………………… 26

BLACK'S LAW DICTIONARY, 11th Ed. (2019)………………………………………… 26

Calder M. Pickett, VOICES OF THE PAST: KEY DOCUMENTS IN THE
HISTORY OF AMERICAN JOURNALISM. 200 (1977)…………………………………30

Kenneth S. Davis, "Kansas: A History" p. 160 (1984) (first published in 1976)… 29

Norman J. Singer, 3 STATUTES AND STATUTORY CONSTRUCTION
        [FORMERLY, SUTHERLAND STATUTORY CONSTRUCTION], 6th ed. 183 (2001).28

Thomas Frank, WHAT'S THE MATTER WITH KANSAS: HOW
      CONSERVATIVES WON THE HEART OF AMERICA p. 34 (2004) …………….. 30

Thomas Frank, THE PEOPLE, NO: A BRIEF HISTORY OF ANTI-POPULISM, 87 (2020)30

## PRIOR OR RELATED APPEALS

There are no prior or related appeals that pertain to this appeal.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 in that the Plaintiff raised federal questions under Title VII and 42 U.S.C. § 1981 and in that the Plaintiff raised questions of state law under the common law and statutory law of Kansas.

The District Court entered a Memorandum and Order that granted the Defendants' motion for summary judgment on all claims on September 28, 2021. App. Vol. V 153[1] (Mem. at 64, 65) The District Court Clerk entered a Judgment also on September 28, 2021. App. Vol. V 218 (Judgment) The Plaintiff filed a Notice of Appeal on October 26, 2021. App. Vol. V 219 (Notice of Appeal)

This Court has jurisdiction over this appeal by operation of Fed. R. App. P. 4(a)(1)(A) because the Plaintiff filed the Notice of Appeal within thirty days of entry of the judgment.

## STATEMENT OF THE ISSUES

I.     Painter presented sufficient disputes of material fact to clear the motion for summary judgment on the question of whether Pioneer Ridge Nursing Facility discriminated

---

[1] The numbering convention used in this brief is to cite the Volume number of the Appendix followed by the Appendix page number. There are five Volumes for the Appendix. Each starts with the number "1."

against Painter on the basis of race in violation of Title VII and Section 1981.

II.  Painter presented sufficient disputes of material fact to clear the motion for summary judgment on the question of whether Pioneer Ridge Nursing Facility retaliated against Painter for making reports of race discrimination in violation of Title VII and Section 1981 when she was re-assigned to the rapid recovery unit or when she was terminated, or both.

III.  Painter presented sufficient disputes of material fact to clear the motion for summary judgment to show Pioneer Ridge Nursing Facility tortiously interfered with Painter's prospective contractual relationships or expectancies in the form of employment with other nursing facilities.

IV.  This panel should consider overruling *Anderson v. United Tel Co. of Kan.*, 933 F.2d 1500 (10th Cir. 1991) or should certify questions to the Kansas Supreme Court to address the viability of Painter's claim that Pioneer Ridge Nursing Facility blacklisted Painter in violation of K.S.A. 44-117

and 44-119 when it reported Painter to the Kansas Department

for Aging and Disability Services for alleged abuse.

## STATEMENT OF THE CASE AND FACTS

### 1. *Statement of the Case.*

Wendy L. Painter, an L.P.N., worked for Pioneer Ridge Nursing Facility in Lawrence, Kansas from approximately 2006 until her termination in February of 2018.

She filed this lawsuit alleging reverse race discrimination as prohibited by Title VII and by 42 U.S.C. § 1981. She also alleged two Kansas state law claims. One was for tortious interference with prospective business relationships or expectancies. The other was for violation of the Blacklisting statutes at K.S.A. 44-117 and 44-119.

After discovery, the District Court granted summary judgment to the two corporate entities named as defendants. The District Court also denied a motion to certify questions of law pertaining to the Blacklisting statutes to the Kansas Supreme Court.

### 2. *Statement of Facts.*

Pioneer Ridge Nursing, then known as Pioneer Ridge Health and

Rehabilitation hired Wendy L. Painter, L.P.N. in early 2006. App. Vol. I 29 (Pretrial Order, Fact 1 at 2)

At the time Pioneer Ridge terminated Painter in February, 2018, she had three supervisors. One was Debbie Garrett, who was Painter's direct supervisor. The second was Kathleen King-Alvoid, who was Director of Nursing for the facility. The third was Ann Bell, who was the Administrator for the facility. App. Vol I 29, 30 (Pretrial Order, Facts 2, 3 and 4 at 2, 3)

On February 16, 2018, Painter was involved in an argument in which both Painter and a resident's son raised their voices. App. Vol. I 30 (Pretrial Order, Fact 5 at 3) Subsequently, Pioneer Ridge placed Painter on suspension while it investigated the matter. App. Vol. I 30 (Pretrial Order, Fact 7 at 3) Eventually, Pioneer Ridge made a report to the Kansas Department for Aging and Disability Services of alleged neglect committed by Painter for the events of February 16. App. Vol. I 30 (Pretrial Order, Facts 6 and 8 at 3)

Pioneer Ridge determined that Painter had not committed neglect on the day in question App. Vol. I 30 (Pretrial Order, Fact 9 at 3), but terminated Painter for the reason that she had failed to meet a family member's reasonable request. App. Vol. I 30 (Pretrial Order, Fact 10 at 3)

KDADS concluded that Painter had committed abuse and neglect in violation of Kansas law. App. Vol. I 30 (Pretrial Order, Fact 15 at 3)

## SUMMARY OF ARGUMENT

The Plaintiff Painter argues that the District Court incorrectly entered summary judgment on the reverse race discrimination claims by overlooking genuine disputes of material facts and by making inferences in favor of Pioneer Ridge, the moving party.

Painter contends that the District Court erroneously entered summary judgment for Pioneer Ridge on the tortious interference claim by not recognizing salient facts as proof of malice against Painter.

The District Court stated that it was bound by Circuit precedent to grant summary judgment on Painter's Blacklisting statutory claim. Plaintiff is well aware of that precedent but suggests that developments since the precedent was entered demand a different result, one that favors Plaintiff. Painter renews her request for certification of questions of law to the Kansas Supreme Court through a separate motion with this Court.

## ARGUMENT

I.    **Painter presented sufficient disputes of material fact to clear the motion for summary judgment on the question of whether Pioneer Ridge Nursing Facility discriminated against Painter on the basis of race in violation of Title VII and Section 1981.**

**a.  Standard of Review.**

"We review a grant of summary judgment de novo, drawing all reasonable

inferences and resolving all factual disputes in favor of the non-moving party." *DePaula v. Easter Seals El Mirador,* 859 F.3d 957, 968 (10th Cir. 2017).

This issue was raised in the parties' summary judgment briefing and in the District Court's ruling on the motion for summary judgment. App. Vol. I 59 (Doc. 79, Defendants' Memorandum in Support of the Motion for Summary Judgment at 16); App. Vol. II 42 (Doc. 93 Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment at 26); App. Vol. III 186 (Doc. 101, Memorandum and Order at 34)

### b. Midwest Health as Plaintiff's Employer Under Joint Employer or Single Employer Tests, or Both.

The Plaintiff argued to the District Court that Midwest Health, Inc. and Pioneer Ridge Nursing Facility Operation, L.L.C. were joint employers, a single employer of the Plaintiff, or both. In its Memorandum and Order that disposed of the case, the District Court addressed these arguments. App. Vol. V 176-185 (Mem. at 24-33). The District Court held that the Plaintiff had not presented triable issues on either theory. Because of that, the District Court ultimately held that judgment was warranted as a matter of law in favor of Midwest Health on the Plaintiff's Title VII and Section 1981 claims. App. Vol. V 185 (Mem. at 33)

For the purpose of this appeal, the Plaintiff does not challenge that conclusion.

### c. The Plaintiff's Prima Facie Case of Reverse Race Discrimination.

6

The burden of establishing a prima facie case is not onerous. *Plotke v. White,* 405 F.3d 1092, 1099 (10th Cir. 2005), *citing, McCowan v. All Star Maint., Inc.,* 273 F.3d 917, 922 (10th Cir. 2001). The burden is one of production, not persuasion; it can involve no credibility assessment. *Plotke* at 1099, *citing, Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097 (2000).

### i. Evidence of Discrimination Against White Employees.

For the first step of the prima facie case, the Plaintiff must satisfy her burden using one of two tests. The first test is for the Plaintiff to show that as a White person she must show that the Defendants are "one of those unusual employers who discriminates against the majority," *Ewing v. TWA Restaurant Group, Inc.,* No. 08-2024-CM (D. Kan. March 12, 2009), which cited, *Argo v. Blue Cross and Blue Shield of Kanas, Inc.,* 452 F.3d 1193, 1201 (10th Cir. 2006). *Argo*, in turn, cited *Notari v. Denver Water Dept.,* 971 F.2d 585, 589 (10th Cir. 1992).

The second test is "Alternatively, a plaintiff may produce facts sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred." *Argo* at 1201.[2] This evidence may be direct or indirect. *McGarry v. Board of Count Comm'rs of County of Pitkin,* 175 F.3d 1193, 1199 (10th

---

[2] The Plaintiff notes that the court in *Bostock v. Clayton County, Georgia,* 140 S.Ct. 1731 (2020) held that a plaintiff may meet her burden of proof under Title VII by showing that a discriminatory motive for the adverse action was "a but for cause" of the action. *Id.,* at 1739.

Cir. 1999). Title VII prohibits discrimination against [W]hites as well as non-[W]hites. *Id., citing, McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

The Plaintiff contends that she can satisfy the alternate "a but-for" test, for the first step in the prima facie case. In this case, the Plaintiff's immediate supervisor, Kathleen King-Alvoid is a Black person. King-Alvoid showed favoritism toward Black, African-American and African employees who were similarly situated to the Plaintiff. That favoritism expressed itself in disparate treatment in time-off requests, requiring the Plaintiff but not the favored employees to find substitutes for time-off requests; and disparity in matters of discipline, resulting in no discipline for the favored employees when they made mistakes or refused assignments, but false allegations against the Plaintiff for her work performance, or nitpicking her performance.

### ii.    Plaintiff's Qualification to Work at a Nursing Facility.

A showing that the Plaintiff was qualified for her job is the second step in the prima facie case. *Argo* at 1201.

The Defendant Pioneer Ridge alleged that the Plaintiff was not qualified to perform the job from which she was terminated. The factual basis for this was the finding by the Kansas Department for Aging and Disability Services that the Plaintiff

was responsible for abuse and neglect, thus making her ineligible to work in a nursing care facility. App. Vol. I 61 (Def. SJ Br. at 18)

There are two problems with this argument. First, the KDADS finding was made after the Defendant Pioneer Ridge terminated Painter. The finding stated nothing about Painter's qualifications before the termination. Second, On February 1, 2021, the Hon. Mary E. Christopher, Shawnee County, Kansas District Court Judge ruled that the finding of Abuse and Neglect by KDADS never became a final order because the agency never effectively served the notice of the findings on the Plaintiff.  App. Vol. IV 30 (Ex. 44, Mem. Decision and Order at 7) Thus, from at least November 24, 2018, App. Vol. II 36 (SJ Response Br. SOF ¶ 130, Ex. 42 at 1, through at least February 2, 2021, App. Vol. II 37 (SJ Response Br. SOF ¶ 136, Ex. 44 at 1), the Plaintiff was inaccurately listed as a person prohibited from working in a nursing care facility. The Defendant Pioneer Ridge put the future before the present.

Additionally, Bell testified that if the interactions of February 16, 2018 between the resident's son and the Plaintiff had not occurred, the Plaintiff would still be employed at Pioneer Ridge potentially. App. Vol. IV 63, 67 (SJ Response Br. Ex. 52, Bell Dep. 251:20-24)

### iii.    Adverse Job Action.

The Defendants did not address the third step of the prima facie case,

which is that the Plaintiff have suffered an adverse job action. Ordinarily, this means the Defendants do not allege an absence of evidence for the Plaintiff's on this point. Nevertheless, the Plaintiff addressed this point. It is undisputed that the Defendants terminated the Plaintiff. App. Vol. I 30 (Pretrial Order, Stip. Fact 11, at 3)

Termination, or firing, is an action against an employee that is considered to be an adverse job action. *Braxton v. Nortek Air Solutions, LLC,* 769 Fed.App. 600, 604 (10th Cir. 2019), *following, Burlington Indus, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). This satisfied the third step.

### iv.    Plaintiff's Position Remained Open.

The fourth step in the prima facie case is that the Plaintiff was treated less favorably than others. For example, the position at issue remained open after the adverse employment action. *Argo* at 1201.

The Defendants do not contend that the Plaintiff's position was eliminated. Similarly, they do not argue that there is an absence of evidence to support this element.

The Plaintiff has cataloged the various ways in which she was subjected to disparate treatment at the hands of King-Alvoid, one of her supervisors. App. Vol. II 30, 31 (Response Br. for MSJ, SOF ¶ 88 at 14, 15) The Plaintiff submits that she has satisfied her burden to state a prima facie case on this claim.

Yet, the District Court found that Plaintiff did not offer specific facts to connect her disparate treatment with her termination. App. Vol. V 188-190 (Mem. at 36-38) The District Court did not state what the specific facts she offered were related to instead of her termination. A reasonable jury could have connected those facts to the termination. Plaintiff discusses this further in the pretext section below.

The District Court did not analyze the remaining elements of the Plaintiff's prima facie case, namely, Plaintiff's qualifications to hold a position at a nursing facility, evidence of an adverse job action and whether Plaintiff's position remained open. Nonetheless, the District Court proceeded to analyze the other steps in the *McDonnell Douglas* test because "… a reasonable factfinder could infer plaintiff's termination was connected to her disparate treatment in other ways." App. Vol. V 190 (Mem. at 38)

### v.    The Stated Reasons for Plaintiff's Termination.

If the Plaintiff has established a prima facie case, the burden shifts to the moving party to come forward with a legitimate nondiscriminatory reason for its action against the Plaintiff. *Mitchell v. City of Wichita, Kansas,* 140 Fed.App. 767 (10th Cir. 2005), *citing, McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The Defendants begin by saying that they terminated Painter because 1) she failed to comply with a reasonable request from the holder of a DPOA [Durable

Power of Attorney]; and 2) acted discourteously and unprofessionally. App. Vol. I 62 (Def. SJ Br. at 19)

Yet, in the very next sentence, the Defendants state the "it was not the first time she violated Pioneer Ridge Nursing's policies. App. Vol. I 62 (Def. SJ Br. at 19) Pioneer Ridge was suggesting that a past violation of policies were also reasons for the termination.

Additionally, the Midwest Health's General Counsel, Jennifer Sourk, told the U.S. Equal Employment Opportunity Commission in response to the Charge of Discrimination filed by Painter that Pioneer Ridge terminated Painter because she had cost the Defendants about $24,000 as a result of an audit by the U.S. Department of Health and Human Services of Pioneer Ridge in 2017. App. Vol. II 98, 99 (Response Br. to MSJ, Ex. 26, Sourk Letter at first page)

Plaintiff contends that Pioneer Ridge did not state a legitimate business reason for the termination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) ("clear and reasonably specific explanation" required) The first reason, that she did not honor the request of a son of a resident to assess the resident, is not a policy-based reason. The second reason, that she acted unprofessionally is vague with respect to Painter's interactions with the resident's son.

      **vi.**    **Pretext.**

However, assuming that the employer states a legitimate business reason for the termination, the burden swings back to the Plaintiff to demonstrate that the employer's stated reasons were false or pretextual. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097 (2000). A plaintiff shows pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Swackhammer v. Sprint/United Management Co.,*493 F.3d 1160, 1167 (10th Cir. 2007), *citing, Plotke v. White,* 405 F.3d 1092, 1102 (10th Cir. 2005), *quoting, Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997).

The Defendants have proffered inconsistent explanations for terminating Painter. Violations of work rules, prior violations of policies, and incurring a large expense for the Defendants as a result of an audit have all been offered as reasons. App. Vol. II 99, 100 (Response Br. for MSJ SOF ¶ 78 at 12, 13, Ex. 26, Sourk Letter, first and second pages) Sourk told the EEOC the reason Painter was terminated was, "In summary, Pioneer Ridge terminated Ms. Painter's employment for resident neglect." App. Vol. II 100 (Response Br. for MSJ, Ex. 26 Sourk Letter, second page) This contradicted Pioneer Ridge's report to the state of Kansas, which stated that the

facility found that Painter had not committed neglect. App. Vol. V 58 (Reply Br. on

MSJ, Ex. 7, Report of Alleged Neglect or Abuse, second page) Those reasons are in

addition to the stated reasons.

Some of the stated work rule violations are incoherent. For example, one rule

Painter supposedly broke was one prohibiting the taking of photos of a resident.

There is no evidence to support that rule violation. App. Vol. II 28, 29 (Response

Br. for MSJ, SOF ⁋ 78, at 12, 13, Ex. 3 Employee Disciplinary Action Record, p.1,

Rule 37) and App. Vol. IV 75, 78 (Response Br. for MSJ Ex. 54, Code of Conduct)

The District Court's analysis of this issue is misplaced. The District Court

cited to cases that relied on the defense of "honest belief," including *Debord v.*

*Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013). App. Vol. III

191 (Mem. at 40) This defense asks only "whether the employer honestly believed

those [proferred] reasons and acted in good faith upon those beliefs." *Id.* App. Vol.

V 192 (Mem. at 40)

As explained by this Circuit, the employee-plaintiff must be permitted, under

the pretext prong of *McDonnell Douglas,* to show that there is a triable inference

that the stated reasons for the adverse action underlying an employer's ostensibly

honest belief are a pretext for discrimination. *Dewitt v. Southwestern Bell Tel. Co.*,

845 F.3d 1299, 1311 (10th Cir. 2017).

The Plaintiff attempted to make this showing by pointing out the inconsistent reasons for Painter's termination. In each instance, the District Court dispenses with the inconsistent reasons by asserting that no reasonable jury could draw the conclusion urged by Painter. Plaintiff suggests that this manner of analysis violates the rule on summary judgment that the court may not make inferences on behalf of the moving party. *Tolan v. Cotton,* 134 U.S. 1861, 1867-68 (2014).

**II.    Painter presented sufficient disputes of material fact to clear the motion for summary judgment on the question of whether Pioneer Ridge Nursing Facility retaliated against Painter for making reports of race discrimination in violation of Title VII and Section 1981 when she was re-assigned to the rapid recovery unit or when she was terminated, or both.**

**a.  Standard of Review.**

"We review a grant of summary judgment de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party." *DePaula v. Easter Seals El Mirador,* 859 F.3d 957, 968 (10th Cir. 2017). This issue was raised in the parties' summary judgment briefing and in the District Court's ruling on the motion for summary judgment. App. Vol. 1 65 (Defendants' Memorandum in Support of the Motion for Summary Judgment at 22); App. Vol. II 48 (Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment at 32); App. Vol. V 196 (Memorandum and Order at 44)

**b. Prima Facie Case.**

The Prima Facie elements of a retaliation case under Title VII and under Section 1981[3] are: 1) the plaintiff engaged in protected activity; 2) the plaintiff suffered an adverse action that a reasonable employee would have found material; and 3) there is a causal nexus between the plaintiff's opposition and the employer's adverse action. *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1086 (10th Cir. 2007).

The court in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) explained the parameters of the second element. The *White* court held that a plaintiff must show "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68.

Plaintiff contended that she had sufficient evidence to support the first step, that is, whether she had engaged in protected activity. Her evidence was that she had presented specific complaints about disparate discipline, time-off requests and work assignments. She presented those complaints to Administrator Ann Bell. App. Vol. II 50 (Response Br. for MSJ at 34)

The District Court held that a reasonable juror might find the Plaintiff engaged in protected activity when she made her second complaint to Ms. Bell in October,

---

[3] *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011)

2017. App. Vol. V 199 (Mem. at 47) In that complaint, Painter testified in her deposition that her job performance was questioned on a daily basis, could not get time off when she requested it, had to find her own replacement when she was sick and was assigned to the Rapid Recovery Unit when other nurses could refuse that assignment. App. Vol. V 199 (Mem. at 47)

The District Court further held that a reasonable factfinder could determine that complaining about "inconsistent" treatment in this setting expressed more than general dissatisfaction. App. Vol. V 199, 200 (Mem. at 47, 48) *See, Hinds v. Sprint/United Management Co.,* 523 F.3d 1187, 1203 (10th Cir. 2008) (vague reference to discrimination without any indication that the conduct was motivated by race is not protected activity).

### c. Causal Connection.

The District Court did not question that Plaintiff had suffered an adverse action that was sufficient to show that the action would dissuade a reasonable worker from making a complaint. That meant that the analysis moved to the third step in the prima facie case: whether there was a causal connection between the protected activity and the adverse action. App. Vol. V 200 (Mem. at 48) Painter conceded and the District Court recognized that there was at least a three-month gap in time between her second complaint in October, 2017 and the date of her termination. *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999).

17

Besides the termination, Painter alleged that assignment to the Rapid Recovery Unit was a retaliatory act. The District Court faulted Plaintiff for not providing specific dates for when her African-American supervisor assigned her to that Unit. App. Vol. V 201, 202 (Mem. at 49, 50)

Plaintiff averred that the assignments to the Unit continued after the second complaint. App. Vol. V 201 (Mem. at 49) This was insufficient, the District Court said, to permit a reasonable jury to find that there was a causal connection. App. Vol. III 202 (Mem. at 50)

To Plaintiff, specific dates of assignment are not necessary to permit a reasonable inference that the assignments to the Unit were continuing to be made after the second complaint. The specificity of the dates is almost immaterial. The fact, unrebutted by Pioneer Ridge or by the District Court, is that the assignments continued to be made.

As to the other adverse act, the termination, Plaintiff had conceded that Circuit precedent had established that a three-month time gap between the complaint and the adverse act was too tenuous to stand alone as proof of a causal connection. *Anderson, supra,* at 1179. The District Court concluded without further explanation that this precedent controlled the issue. App. Vol. V 202, 203 (Mem. at 50, 51)

This ignores the other means available to a plaintiff to establish a triable issue, which in this case, is that the retaliation was accomplished through assignment to

the Rapid Recovery Unit and culminated in the termination. Painter argued this point in her summary judgment response brief. App. Vol. II 52 (Response Br. for MSJ at 36)

This Court should reverse on this point.

**III.    Painter presented sufficient disputes of material fact to clear the motion for summary judgment to show Pioneer Ridge Nursing Facility tortiously interfered with Painter's prospective contractual relationships or expectancies in the form of employment with other nursing facilities.**

**a.  Standard of Review.**

"We review a grant of summary judgment de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party." *DePaula v. Easter Seals El Mirador,* 859 F.3d 957, 968 (10th Cir. 2017). This issue was raised in the parties' summary judgment briefing and in the District Court's ruling on the motion for summary judgment. App. Vol. 1 67 (Defendants' Memorandum in Support of the Motion for Summary Judgment at 24); App. Vol. II 52 (Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment at 36); App. Vol. V 207 (Memorandum and Order at 55)

**b.  Elements of Claim.**

The elements of a claim of tortious interference with prospective contractual

relationships or expectancy are: 1) the existence of a business relationship or expectancy with the probability of economic benefit to the plaintiff; 2) knowledge of the relationship or expectancy by the defendant; 3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; 4) intentional misconduct by defendant; and 5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct. *Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106, 1115 (1986)

Although not stated as an element, tortious interference is predicated on malicious conduct by the defendant. *Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 872 P.2d 252 (1994). Ultimately, the District Court concluded that summary judgment was proper on this claim because the record presented no triable issue as to whether Pioneer Ridge Nursing acted with the requisite malice. App. Vol. V 209, 210 (Mem. at 57, 58)

The District Court noted that the Plaintiff's evidence of malice was circumstantial. App. Vol. V 210 (Mem. at 58) One of the constellations of this evidence as proffered by Plaintiff suffices to support a triable issue of malice. It follows.

i.    **Pioneer Ridge's Report of Alleged Abuse by Painter to the Kansas Department for Aging and Disability Services.**

Shortly before Pioneer Ridge terminated Painter, the facility submitted a

report of alleged abuse by Painter to the Kansas Department for Aging and Disability Services. App. Vol. V 210 (Mem. at 58) The District Court noted that the description of the incident that prompted the report, as prepared by Kathleen King-Alvoid, was "tame" as compared with the description Painter gave in her deposition. App. Vol. V 210, 211 (Mem. at 58, 59)

That may be an accurate comment on the report. But it obscures two facts. One, the report was made after Pioneer Ridge made its own finding that there had been no neglect. App. Vol. V 212 (Mem. at 60) It is unexplained why Pioneer Ridge even made the report. To Plaintiff's way of thinking, this was Pioneer Ridge's attempt to have Painter administratively adjudicated as prohibited from working in a nursing care facility. And, that's exactly what happened.

On October 25, 2018, KDADS issued a "Notice of Finding of Abuse and Neglect" on Painter. App. Vol. II 36 (Response Br. for MSJ at 20, SOF ⁋ 130, Ex. 42, Notice of Finding of Abuse and Neglect at 1) It then failed to serve this Notice on Painter because Pioneer Ridge gave KDADS an old address in its report of alleged abuse. App. Vol. II 35 (Response Br. for MSJ at 21, SOF 136) In a related action, Hon. Mary E. Christopher, Shawnee County, Kansas District Court Judge held that the "Notice" never became a final order because it was never effectively served on Plaintiff. App. Vol. II 37 (Response Br. for MSJ at 21, SOF ⁋ 136, Ex. 44, Memorandum Decision and Order at 7) Thus, from at least November 24, 2018

21

through February 2, 2021, KDADS listed Painter was as a Prohibited person and was unable to work in a nursing care facility for that reason.

Yet, the District Court found that no reasonable jury could find that King-Alvoid acted with malice toward Painter when she submitted the report to KDADS. App. Vol. V 212, 213 (Mem. at 60, 61) The District Court had to make inferences in favor of the moving party to reach that result, again, in contravention of summary judgment practice. Put another way, it is equally – if not more – likely to conclude that King-Alvoid acted with malice toward Painter when she submitted the report.

### c. Kansas Cases.

The Kansas cases are instructive in understanding the summary judgment analysis of this claim.

In *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 425, 77 P.3d 130 (2003) the court reversed summary judgment in favor of the employer on an interference claim because the trial court had improperly evaluated motive, justification and harm to the plaintiff. The court held, "[t]he issues of defendants' motive and the presence or absence of malice are typically questions for the jury." *Id.*

As in this case where the Defendants assert a duty to communicate reports of alleged abuse or neglect by their employees, the court in *Cohen v. Battaglia*, 296 Kan. 542, 293 P.3d 752 (2013) addressed a similar argument. There, the court reversed summary judgment for the employer on an interference claim and stated in

part: "The problem is the panel's conclusion that Accurso conveyed only 'truthful information' was effectively a factual determination which is inappropriate on a dispositive motion." *Id.,* Kan. at 549.

Here, the Court cannot weigh the allegations of the Defendants that they only performed a regulatory duty in conveying information to KDADS against the allegations of malice as presented by the Plaintiff.

    **IV.**   **This panel should consider overruling *Anderson v. United Tel Co. of Kan.*, 933 F.2d 1500 (10th Cir. 1991) or should certify questions to the Kansas Supreme Court to address the viability of Painter's claim that Pioneer Ridge Nursing Facility blacklisted Painter in violation of K.S.A. 44-117 and 44-119 when it reported Painter to the Kansas Department of Aging and Disability Services for alleged abuse using an incorrect address for Painter.**

    **a. Standard of Review.**

"We review a grant of summary judgment de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party." *DePaula v. Easter Seals El Mirador,* 859 F.3d 957, 968 (10th Cir. 2017). This issue was raised in the parties' summary judgment briefing and in the District Court's ruling on the motion for summary judgment. App. Vol. 1 69 (Defendants' Memorandum in Support of the Motion for Summary Judgment at 26); App. Vol. II 56 (Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment at 40); App. Vol. V 214 (Mem. at 62)

    **b. Kansas Statutory Blacklisting.**

The case of *Anderson v. United Tel. Co.,* 933 F.2d 1500, 1502-03 (10th Cir. 1991) held that a criminal conviction was required to support a claim of Blacklisting under K.S.A. 44-117 and 44-119. The Plaintiff concedes that there has been no criminal conviction to support the claim.

The District Court considered itself bound by *Anderson* and cited three District of Kansas cases that followed *Anderson.* Thus, the District Court did not entertain the Plaintiff's arguments for deviation from *Anderson.*

Those arguments follow two tracks that are independent of each other. Plaintiff suggests both tracks support a good faith basis for arguing that *Anderson* should be overruled either on the ground that it was incorrectly decided or that a statutory development after the opinion was issued demands a different result. Under either argument, Painter contends that a criminal conviction is not necessary to sustain a triable claim of Blacklisting.

The Plaintiff will be filing a motion with this Court to certify this question to the Kansas Supreme Court, which is authorized to accept questions certified to it by this Court as provided in K.S.A. 60-3201, et seq. Painter filed a motion to certify with the District Court. In response, the District Court held that because this Circuit had already decided one of the issues proposed for certification it would deny the motion. App. Vol. V 216 (Mem. at 64)

The basis for the Plaintiff's argument, in part, is drawn from an opinion from the District Court of Harvey County, Kansas by District Court Judge Richard B. Walker in the case of *Jill D. Rowland v. U.S.A. 800, Inc.*, Case No. 14-CV-12 on February 17, 2015. A certified copy of the opinion is in the Record. App. Vol. IV 46-222 (Response Br. for MSJ, Ex. 48, Decision of the Court)

In *Anderson*, the court considered the proper interpretation of the Blacklisting statutes. The first step was to ascertain the Legislature's intent by looking at the statutory language. *Id.,* at 1502. The court noted the legislative purpose was generally expressed in the ordinary meaning of the words used in the statutes. *Id.* The court stated that the Legislature's use of two different terms is presumed to be intentional. *Id.*

The opinion in *Anderson* noted that K.S.A. 44-119 uses the terms "guilty" and "liable." The court stated, "Presuming the use of both terms to be intentional, we construe these terms in an ordinary way to mean criminal guilt and civil liability." *Id.,* at 1503. The court cited to no authority for that conclusion.

Judge Walker's opinion takes a similar approach but arrives at a different conclusion. In this part of his opinion, Judge Walker essentially declares that *Anderson* was wrongly decided. He observed BLACK'S LAW DICTIONARY defined "guilty" as having a criminal law meaning but also "responsible for a civil wrong or

25

answerable in law; legally obligated." App. Vol. IV 48 (Response Br. for MSJ, Ex. 48, Decision of the Court at 2)

All editions of Black's currently available to counsel, the First**,** the Fifth, the Eighth, and the Eleventh are consistent with the verbiage cited for "guilty" by Judge Walker. In the First, the first definition is, "Having committed a crime or tort;" BLACK'S LAW DICTIONARY, 1st ed. 553 (1891). A "tort" was defined as, "In modern practice, *tort* is constantly used as an English word to denote a wrong or wrongful act, for which an action will lie, as distinguished from a *contract." Id.,* at 1178. (italics in original). In the Fifth, the first definition listed for "guilty" was "Having committed a crime or tort." BLACK'S LAW DICTIONARY, 5th ed. 637 (1979). A "tort" was a "Private or civil wrong or injury …" *Id.,* at 1335. In the Ninth, the second definition for "guilty" listed was, "Responsible for a civil wrong, such as a tort or breach of contract." BLACK'S LAW DICTIONARY, 9th Ed. 727 (2004). That edition defined "tort" first as "A civil wrong, other than breach of contract, for which a remedy may be obtained ..." *Id.,* at 1527.

The most recent edition of BLACK'S, the Eleventh, was published in 2019. The second definition for "guilty" is "Responsible for a civil wrong, such as a tort or breach of contract." BLACK'S LAW DICTIONARY, 11th Ed. (on-line version). The first definition for "tort" is, "A civil wrong, other than breach of contract, for which a

remedy may be obtained, usu. in the form of damages." BLACK'S LAW DICTIONARY, 11th Ed. (on-line version)[4]

Judge Walker's conclusion was driven in part by his review of K.S.A. 44-119a, which was passed into law in 1995. This part of his opinion requires only the Court find that *Anderson* was correct at the time it was issued but became wrong with the passage of this statute. Judge Walker refers to a letter from State Representative Gary Haulmark to the House and Senate committees that conducted hearings on the bill. The letter is in the Record. App. Vol. IV 52 (Response Br. for MSJ, Ex. 49, Haulmark Letter) The statute sets up a regime of qualified immunity or absolute immunity depending upon what information an employer discloses to a prospective employer of a current or former employee.

The effect of the statute, according to Judge Walker, is to protect employers from civil liability when they disclose *truthful* employee information of the nature described in the statute. App. Vol. IV 50 (Response Br. for MSJ, Ex. 48, Decision of the Court at 4) (emphasis in original). "Conversely, it appears that legislators were *not* intending to extend such immunity from civil liability to employers who would actively seek to" commit the acts described in K.S.A. 44-117. *Id.* (emphasis in original).

---

[4] BLACK'S LAW DICTIONARY, 11th ed. (on-line version; site last visited August 31, 2020)

Judge Walker then cleared the Blacklisting statutes as providing for a private right of action. "The second part of the test, whether the legislative history manifests the intent to create a private right of action, is clarified by the action of the 1995 Legislature, or more properly by the legislative *inaction* by leaving the three blacklisting-related statutes on the books while delimiting their application to certain carefully crafted circumstances under K.S.A. 44-119a" App. Vol. IV 51 (Response Br. for MSJ, Ex. 48 Decision of the Court at 5). He permitted the plaintiff in that case to amend her petition to include a claim of Blacklisting.

The Court should adopt Judge Walker's reasoning and allow Plaintiff to pursue his blacklisting claim against Pioneer Ridge.

Another principle of statutory construction that is applicable here is that statutes that are remedial in nature are to be construed broadly. *See, Squires v. City of Salina*, 9 Kan. App. 2d 199, 202, 675 P.2d 926, 929 (1984) (Kansas law); *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S. Ct. 548, 553, 19 L. Ed. 2d 564 (1967) (federal law). "Remedial statutes are liberally construed to suppress the evil and advance the remedy." Norman J. Singer, 3 STATUTES AND STATUTORY CONSTRUCTION [FORMERLY, SUTHERLAND STATUTORY CONSTRUCTION], 6th ed. 183 (2001). The Age Discrimination in Employment Act and the Pregnancy Discrimination Act have been described as remedial. *Id.,* at 200-01.

"'Socioeconomic' legislation has been said to be entitled to a liberal construction."

*Id.,* at 201.

Additionally, a textualist approach includes interpretation of a statute in the context of the sociopolitical atmosphere in which the statute was passed.

> The Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations.

*Bostock v. Clayton County,* 140 S.Ct. 1731, 1738 (2020), citing, *New Prime, Inc. v. Oliveira*, 139 S.Ct. 532, 538-539, 202 L.Ed.2d 536 (2019).

In *Bostock,* the court oriented itself to the time of the passage of the statute at issue, which was the Civil Rights Act of 1964. *Id.* The Kansas Legislature passed the Blacklisting statutes in 1897. With that in mind, the Plaintiff turns to the national and Kansas social and political climate of the late 1890s. In the summer of 1896, William Jennings Bryan of Nebraska gave his "Cross of Gold" speech to the Democratic national convention on behalf of "free silver." Kenneth S. Davis, "Kansas: A History" p. 160 (1984) (first published in 1976). In the elections of 1896, the Populist Party in Kansas won every statewide office and won majorities in both houses of the Legislature. *Id.* The Populist Party stood for, among other reforms, a graduated income tax, an eight-hour work day, "free silver" in a ratio of sixteen-to-

one and government ownership of the railroads, telegraph and telephone. *Id.,* at 154. The Legislature of 1897 operated in this milieu.

The original "What's the Matter with Kansas" was a rhetorical shot at the Populists in Kansas. Calder M. Pickett, VOICES OF THE PAST: KEY DOCUMENTS IN THE HISTORY OF AMERICAN JOURNALISM. 200 (1977). The piece, written by William Allen White, editor of "The Emporia Gazette," was published in August of 1896. It delivered a glancing blow at Bryan's speech in a sarcastic tone. *Id.,* at 202. The editorial was such a hit that the Republican National Committee picked it up and used it against Bryan in the Presidential campaign. *Id.,* at 200.

In retrospect, the mood was that, "[T]he Populists saw their movement as a sort of revelation, a moment when an entire generation of 'Kansas fools' figured out that they'd been lied to all their lives." Thomas Frank, WHAT'S THE MATTER WITH KANSAS: HOW CONSERVATIVES WON THE HEART OF AMERICA p. 34 (2004). When White looked back in a retrospective column in 1936, "he saw Populism not as an episode of mass hysteria but as the respected granddaddy of all reformers who had come since – Teddy Roosevelt, Woodrow Wilson and now FDR."[5] Thomas Frank, THE PEOPLE, NO: A BRIEF HISTORY OF ANTI-POPULISM, 87 (2020).[6]

---

[5] William Allen White, "40 Years: New Men, Old Issues," THE NEW YORK TIMES, August 9, 1936.

[6] The book's title is a twist on the Carl Sandburg poem, "The People, Yes": "When have the people been half as rotten as what the panderers to the people dangle before crowds?" *Id.,* prefatory material.

Opponents of this statutory interpretation must explain why the Kansas Legislature would pass a set of statutes that now, under *Anderson,* can rarely, if ever, be enforced. The Blacklisting statutes were meant to be stiff economic medicine for workers – the people. This Court should enforce them.

## CONCLUSION

This Court should reverse the entry of summary judgment on all of the Plaintiff's claims so that those claims may be presented to a jury.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff suggests that oral argument would greatly assist the Court in coming to a fulsome understanding of the party's points and arguments presented in the briefs.

## CERTIFICATE OF COMPLIANCE

I certify that the brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,328 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2015 in 14-point Times New Roman.

Dated: February 18, 2022.

*/s/ Theodore J. Lickteig*_____
Theodore J. Lickteig

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

1) All required privacy redactions have been made as required by 10th Cir. R
   25.5;

2) The hard copies that will be submitted to the Clerk's Office are exact
   copies of the ECF filing; and

3) The ECF submissions have been scanned for viruses with the 2019 version
   of eSet and, according the software are free of viruses.

Dated: February 25, 2022

*/s/ Theodore J. Lickteig*_____
Theodore J. Lickteig

**CERTIFICATE OF SERVICE**

I certify that I submitted the above and foregoing for filing with the Clerk's

Office on the 25th day of February, 2022 using the Court's CM/ECF system, which

will provide notification to the following counsel of record.

Stephen D. Lanterman
slanterman@sloanlawfirm.com
Kelly J. Trussell
ktrussell@sloanlawfirm.com
Sloan Eisenbarth Glassman McEntire & Jarboe
534 S. Kansas Avenue, Suite 1000
Topeka, Kansas 66603
*Attorneys for Appellees-Defendants*

*/s/ Theodore J. Lickteig*_____

**ATTACHMENTS**

Memorandum and Order of the District Court, September 28, 2021.

Judgment, September 28, 2021.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

**WENDY L. PAINTER,**

       **Plaintiff,**

v.

                                   **Case No. 19-2336-DDC**

**MIDWEST HEALTH, INC., et al.,**

       **Defendants.**

---

### <u>MEMORANDUM AND ORDER</u>

Plaintiff Wendy L. Painter brings this employment discrimination lawsuit against defendants Midwest Health, Inc. ("Midwest Health") and Pioneer Ridge Nursing Facility Operations, LLC ("Pioneer Ridge Nursing").  She asserts six claims:  (1) reverse race discrimination violating Title VII of the Civil Rights of 1964 ("Title VII"), 42 U.S.C. § 2000e; (2) retaliation violating Title VII, 42 U.S.C. § 2000e; (3) reverse race discrimination violating 42 U.S.C. § 1981; (4) retaliation violating 42 U.S.C. § 1981; (5) a Kansas common law claim for tortious interference with prospective contractual relationship or expectancy; and (6) blacklisting violating Kan. Ann. Stat. §§ 44-117 and 44-119.  Doc. 77 at 9 (Pretrial Order ¶ 4.a.).

This matter comes before the court on defendants' Motion for Summary Judgment (Doc. 78) and plaintiff's Motion to Certify Questions of Law to Kansas Supreme Court (Doc. 100).  Plaintiff filed a Response (Doc. 93).  And defendants filed a Reply (Doc. 95).  After considering the parties' arguments, the court grants defendants' Motion for Summary Judgment.  The court explains this ruling, below.

I.      **Summary Judgment Facts[1]**

Defendant Pioneer Ridge Nursing is an assisted living nursing facility in Lawrence,

Kansas.  Pioneer Ridge Nursing hired plaintiff as a Licensed Practical Nurse around January 2,

2006.  Doc. 77 at 2 (Pretrial Order ¶ 2.a.1.).

### *Pioneer Ridge Nursing and Midwest Health*

Plaintiff's employment was terminated by her employer on February 22, 2018.  Doc. 77

at 3 (Pretrial Order ¶ 2.a.11.).  Plaintiff filed her first Complaint on June 22, 2019.  Doc. 1.  It

named "Midwest Health, Inc. d/b/a Pioneer Ridge Health and Rehabilitation" as the only

defendant.  *Id.*  Plaintiff added Pioneer Ridge Nursing as a defendant in the Third Amended

Complaint, filed September 10, 2020.  Doc. 61.

In February 2020, Midwest Health informed plaintiff, via letter, that she had sued the

wrong entity; that plaintiff's employer was "Pioneer Ridge Nursing Facility—not Midwest

Health".  Doc. 93-7 at 2.  In June 2020, Midwest Health answered plaintiff's interrogatories.

Doc. 93-9.  In these answers, Midwest Health referred to plaintiff's employer as "Pioneer Ridge"

and "Pioneer Ridge Nursing Facility."  *Id.* at 3, 4, 6.  The Kansas Business Entity Search does

not list any entities named "Pioneer Ridge Nursing Facility" or "Pioneer Ridge," the names

Midwest Health had provided.  Doc. 93-8.  It is uncontroverted that Midwest Health served its

answers to these interrogatories 63 days late.  Doc. 93 at 16; Doc. 95 at 10.

On July 28, 2020, plaintiff deposed Ms. Jennifer Sourk, Midwest Health's designated

corporate representative.  Doc. 93-5 at 2.  During her deposition, Ms. Sourk clarified that

---

[1]      The following facts either have been stipulated by the parties in the Pretrial Order (Doc. 77), are
uncontroverted, or, where controverted, are stated in the light most favorable to the plaintiff, the party
opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

plaintiff was employed by "Pioneer Ridge Nursing Facility Operations, LLC". *Id.* at 4 (Sourk

Dep. 23:11–13). After deposing Ms. Sourk, plaintiff moved for leave to amend her Complaint.

Doc. 49. United States Magistrate Judge Angela D. Mitchell, in her Order granting Plaintiff's

Motion for Leave to File a Third Amended Complaint, found that plaintiff "did not receive

accurate information as to the specific business entity that Midwest Health contends is her true

employer until July 28 . . . ." Doc. 55 at 5. So, the court granted leave for plaintiff to amend her

Complaint to name Pioneer Ridge Nursing as a defendant. And, plaintiff contends that both

Pioneer Ridge Nursing and Midwest Health were her employer. Next, the court describes the

relationship between defendant Midwest Health and defendant Pioneer Ridge Nursing.

In 2010, Midwest Health and Pioneer Ridge Nursing entered a "Management

Agreement." Doc. 93-11. This Management Agreement was in effect when plaintiff's

employment terminated. Doc. 93-5 at 11 (Sourk Dep. 67:17–19). Under the Management

Agreement, Midwest Health provides "specialized services" to Pioneer Ridge Nursing,

specifically: financing, accounts receivable, accounts payable, requisition of supplies,

maintenance, financial reports, income tax returns, developer services, legal services, and "fringe

benefits." Doc. 93-11 at 2–6. The Management Agreement provides a "not all-inclusive" list of

"fringe benefits," they include: "personnel services, counseling, health insurance, retirement

benefits[,] and other possible qualified benefits for [Pioneer Ridge Nursing's] employees." *Id.* at

6.

The Management Agreement explicitly provides that Midwest Health and Pioneer Ridge

Nursing "both . . . have an interest in insuring that the two companies are viewed as separate and

distinct entities" and imposes on both "an affirmative duty to correct any misunderstanding

known to it that any other party believes the two parties to be the same or a related entity." Doc.

93-11 at 7–8.  The Management Agreement specifies that Midwest Health and Pioneer Ridge

Nursing "shall at all times maintain that they are separate and distinct legal entities."  *Id.*

Beyond the Management Agreement, there is some relationship between Midwest Health

and Pioneer Ridge Nursing.  James A. Klausman signed the Management Agreement on behalf

of both Midwest Health and Pioneer Ridge Nursing.  *Id.* at 9; Doc. 93-5 at 8–9 (Sourk Dep.

62:17–63:7); Doc. 94-6 (Klausman Dep. 9:3–17).  Modification and performance of the

Management Agreement is subject to James A. Klausman's sole discretion.  Doc. 94-6 at 4–5

(Klausman Dep. 22:23–23:2).  James A. Klausman is a shareholder of Midwest Health.  Doc. 93-

5 at 9 (Sourk Dep. 63:8–11).  Pioneer Ridge Nursing is owned by Clayton Enterprises, LLC.  *Id.*

(Sourk Dep. 63:15–19).  In turn, Clayton Enterprises, LLC is owned by the Trust of James Brett

Klausman, the Trust of Michael Klausman, the Trust of Jamie Eaton, and the Trust of Floyd C.

Eaton, III.  *Id.* (Sourk Dep. 63:20–24).  James B. Klausman is James A. Klausman's son.  *Id.* at

9–10 (Sourk Dep. 63:25–64:2).  Michael Klausman is James A. Klausman's son.  *Id.* at 10

(Sourk Dep. 64:3–6).  Floyd C. Eaton, Jr. is an officer of Pioneer Ridge Nursing and a

shareholder of Midwest Health.  *Id.* (Sourk Dep. 64:7–16).

Also, Midwest Health helped Pioneer Ridge Nursing with certain tasks.  Pioneer Ridge

Nursing's promotional materials advertise that Pioneer Ridge Nursing is a "Proud Member of

Midwest Health Family of Communities[.]"  Doc. 93-14 at 2.  On August 12, 2020, on its

Facebook page, Midwest Health posted jobs available at "Pioneer Ridge Health & Rehab."  Doc.

93-17 at 2.  Midwest Health "staff members" were available for "consultation" if a Pioneer

Ridge Nursing "supervisor or . . . administrator" had questions about human resources.  Doc. 93-

5 at 12 (Sourk Dep. 88:10–19).  Midwest Health consults with Pioneer Ridge Nursing on its

employee handbook but does not provide the exact handbook it uses.[2]  Doc. 93-5 at 3 (Sourk

Dep. 18:1–23).  Midwest Health does not participate in Pioneer Ridge Nursing's hiring and firing

decisions.  Doc. 93-5 at 12 (Sourk Dep. 88:10–19).  C. Marie Vogel, Midwest Health's Vice

President of Skilled Nursing Facilities, is involved in hiring decisions "if administrators have

questions on qualifications."  Doc. 93-6 at 3, 5 (Vogel Dep. 12:19–24, 93:9–24).  Otherwise, Ms.

Vogel is not routinely involved with hiring.  *Id.* at 5 (Vogel Dep. 93:21–24).  Midwest Health

provides a consultant who is available to facilities "to support the facility though the [on-site]

survey process" by state regulators.  Doc. 93-6 at 4 (Vogel Dep. 18:2–14).

### Plaintiff, Pioneer Ridge, and Midwest Health

Next, the court examines plaintiff's relationship with Pioneer Ridge Nursing and

Midwest Health during her employment.  Plaintiff worked at the Pioneer Ridge Nursing

facilities.  Doc. 80-3 (Pl.'s Dep. 41:3–10).  Pioneer Ridge Nursing employees supervised

plaintiff.  Doc. 80-3 at 4–5 (Pl.'s Dep. 44:2–45:1).  Pioneer Ridge Nursing controlled plaintiff's

staffing (Doc. 81-2), performance reviews (Doc. 80-3 at 6–7 (Pl.'s Dep. 46:8–47:1)), time-off

---

[2]     Plaintiff asserts, in her Additional Statement of Fact ¶ 89, that "Midwest Health, Inc. performed various Human Resources tasks for Pioneer Ridge Nursing Facility Operations, LLC, including training and preparation of employee handbooks."  Doc. 93 at 15.  Plaintiff cites Ms. Vogel's deposition, Exhibit 29, at page 47 for this proposition.  *Id.*  However, page 47 is not included in Exhibit 29; Exhibit 29 provides only pages 1, 12, 18, and 93 of Ms. Vogel's deposition.  The court ignores plaintiff's citation to Ms. Vogel's deposition as authority for this statement because plaintiff failed to place this evidence in the record.

In addition to citing Ms. Vogel's deposition, plaintiff also cites Ms. Sourk's deposition.  Doc. 93 at 15 (citing Ex. 28, Sourk Dep. 18:1–5).  Ms. Sourk testified that she "participated in consultation with provisions of certain handbook changes."  Doc 93-5 at 3 (Sourk Dep. 18:1–5).  Ms. Sourk also testified that Midwest Health does not provide the exact employee handbook for defendant Pioneer Ridge Nursing. *Id.* (Sourk Dep. 18:17–23).  No reasonable factfinder could conclude that Ms. Sourk's testimony supports a finding that Midwest Health prepared Pioneer Ridge Nursing's employee handbook.

Thus, plaintiff's cited authority fails to support her statement that Midwest Health performs "training and preparation of employee handbooks."  *See* D. Kan. Rule 56.1(b)(1) (requiring a non-moving party to "refer with particularity to those portions of the record on which the opposing party relies").

and scheduling (Doc. 81-3; Doc. 80-3 at 8 (Pl.'s Dep. 50:18–22)), discipline (Doc. 81-4; Doc. 81-13), and termination (Doc. 81-7; Doc. 80-3 at 6 (Pl.'s Dep. 46:4–7)).

Pioneer Ridge Nursing paid plaintiff using Midwest Health's address.[3]  Additionally, plaintiff's tax documents list "Pioneer Ridge Nursing" as her employer.  Doc. 81-6.  Midwest Health made direct deposits into plaintiff's credit union account designated "ACH MWHICPOOLED."  Doc. 93-15 2–4.

Sometimes, plaintiff interacted with Midwest Health directly.  Midwest Health, Inc. provided plaintiff with health insurance coverage within a "Midwest Health Management, Inc." group.  Doc. 93-5 at 5–6 (Sourk Dep. 27:16–28:17); Doc. 93-16.  Midwest Health provided continuing nursing education to plaintiff.  Doc. 93-18.

---

[3] The entity shown on plaintiff's paystub is "Pioneer Ridge Nursing."  Doc. 81-5; Doc 80-3 at 3 (Pl.'s Dep. 43:4–23).  The address listed for Pioneer Ridge Nursing on plaintiff's paystub is "3024 SW Wanamaker Rd, Topeka, KS 66614."  Doc. 81-5.  Plaintiff asserts an additional statement of fact that provides:  "[t]he address for Midwest Health, Inc. is 3023 SW Wanamaker Rd., Suite 300, Topeka, Kansas 66614."  Doc. 93 at 2, 19.

But this address in plaintiff's Additional Statement of Fact is wrong.

Plaintiff cites plaintiff's Exhibit 26, a letter from Jennifer Sourk, counsel for Midwest Health, Inc., for this address.  *Id.* at 19.  The letterhead lists the address for Midwest Health, Inc. as 3024 SW Wanamaker Rd., Suite 300, Topeka, Kansas, 66614, not 3023 SW Wanamaker.  Doc 93-3 at 2.  Given that the exhibit, rather than the brief, is the evidence and given the summary judgment standard that requires the court to view the controverted facts in the light most favorable to plaintiff, the court corrects plaintiff's Additional Statement of Fact in ¶ 120 to read:  "The address for Midwest Health, Inc. is 3024 SW Wanamaker Rd., Suite 300, Topeka, Kansas 66614."

This is not the end of the payment inquiry.  In Additional Statement of Fact ¶ 121, plaintiff states, "'Pioneer Ridge Nursing' issued paychecks for the Plaintiff using the address of Midwest Health, Inc."  Doc. 93 at 19.  Plaintiff cites plaintiff's payroll stub as support.  Doc. 93-13.  The address on the payroll stub is 3024 SW Wanamaker Rd., Topeka, KS 66614.  *Id.* at 2.  This address matches the corrected address of Midwest Health in Additional Statement of Fact ¶ 120, except for "Suite 300."  Disentangling the facts in the light most favorable to plaintiff, the court concludes the summary judgment facts establish that defendant Pioneer Ridge Nursing paid plaintiff using the address of defendant Midwest Health.

### *Discrimination Against Plaintiff*

When plaintiff was terminated, Ann Bell was Administrator of Pioneer Ridge Nursing. Doc. 77 at 3 (Pretrial Order ¶ 2.a.4.). Plaintiff spoke to Ms. Bell twice—once at the end of 2016 or the beginning of 2017 and once in October 2017—about her feelings that she was being treated unfairly. Doc. 80-3 at 11 (Pl.'s Dep. 58:3–11). Plaintiff was frustrated by the unfair treatment of Kathleen King-Alvoid. *Id.* (Pl.'s Dep. 58:12–25). Ms. King-Alvoid was Director of Nursing at Pioneer Ridge Nursing when plaintiff's employment was terminated. Doc. 77 at 2 (Pretrial Order ¶ 2.a.3.). Ms. King-Alvoid is "African American."[4] Doc. 80-6 at 4 (King-Alvoid Dep. 155:3–5). Ms. Bell is Caucasian. Doc. 80-5 at 17 (Bell Dep. 254:6–10).

In her first conversation with Ms. Bell, plaintiff complained that she was questioned about her job performance while other nurses made errors, other nurses were insubordinate, and plaintiff was reprimanded for eating a cookie at the nurse's station while another nurse ate a sucker. Doc. 80-3 at 11 (Pl.'s Dep. 58:12–25). In her second Complaint, plaintiff told Ms. Bell she was frustrated due to daily questioning about her job performance, denial of time off requests, having to find replacement nurses when she was sick, and repeated assignment to the Rapid Recovery Unit. *Id.* at 12–13 (Pl.'s Dep. 60:15–61:9). Plaintiff told Ms. Bell she felt like Ms. King-Alvoid was "picking on" her compared to other nurses. *Id.* at 13 (Pl.'s Dep. 61:10–15). Plaintiff did not complain of race discrimination precisely,[5] but plaintiff testified that she used the word "discriminating" when she talked to Ms. Bell. Doc. 93-1 at 9–10 (Pl.'s Dep. 93:16–94:3).

---

[4]     Ms. King-Alvoid described her race as "African American." Doc. 80-6 at 4 (King-Alvoid Dep. 155:3–5). So, the court uses her same terminology. It does the same with other individuals referenced in the record—*i.e.*, the court uses the terminology employed by the individual to identify that person's race.

[5]     Ms. Bell testified that plaintiff never complained to her about race discrimination during plaintiff's employment. Doc. 94-11 at 13 (Bell Dep. 250:21–23).

Plaintiff testified that her Black, African American, and African coworkers were treated more favorably by Ms. King-Alvoid and were not disciplined for committing violations of resident care and treatment.  Six of plaintiff's coworkers are discussed in the summary judgment record:  Cameron Starks-Cowper, Hannah Hiram, Herbert Gathages, Mary Gatotho, Tiara Taje, and Taryn Harrell.

Plaintiff testified that Mr. Starks-Cowper, an African American man, was treated better than her.  Specifically, plaintiff alleges that Mr. Starks-Cowper was not disciplined for "failing to write nursing notes, making medication errors, not completing assignments, not signing off on medications timely, not reporting wounds or skin concerns, or not making out the assignment sheets for his shift . . . ."  Doc. 93-1 at 12–13 (Pl.'s Dep. 109:17–110:3); Doc. 94-10 at 2. Plaintiff did not provide specific examples.  Doc. 93-1 at 13–14 (Pl.'s Dep. 110:4–111:1). Plaintiff testified that Mr. Starks-Cowper could take days off without finding a replacement to work for him.  Doc. 93-1 at 14 (Pl.'s Dep. 111:2–13).  Finally, plaintiff testified that Mr. Starks-Cowper replaced her after she was terminated.  Doc. 93-1 at 14–15 (Pl.'s Dep. 111:19–112:7).

The second co-worker plaintiff identifies is Hannah Hiram, an African woman.  Doc. 93-1 at 15 (Pl.'s Dep. 112:8–15).  Plaintiff testified that she witnessed Ms. Hiram tell Ms. King-Alvoid and Ms. Garrett, two supervisors, that Ms. Hiram refused to work at the Rapid Recovery Unit and was not disciplined for this refusal.  Doc. 93-1 at 15–17 (Pl.'s Dep. 112:16–114:2); Doc. 94-10 at 3.  Plaintiff also testified that Ms. Hiram was allowed to take 30 days off work to travel to Africa and did not have to find a replacement.  Doc. 93-1 at 17 (Pl.'s Dep. 114:3–15); Doc. 94-10 at 3.

The third co-worker in the summary judgment record is Herbert Gathages, an African man.  Doc. 93-1 at 19 (Pl.'s Dep. 116:9–14).  Plaintiff testified that Mr. Gathages was not

disciplined for making medication errors, failing to complete assignments, making clinical nursing note errors, failing to assign job tasks to others, and scheduling issues. Doc. 93-1 at 19–20 (Pl.'s Dep. 116:23–117:7); Doc. 94-10 at 3. Plaintiff could not recall specific incidents other than an ordering error that plaintiff made that affected Mr. Gathages. Doc. 93-1 at 20–21 (Pl.'s Dep. 117:8–118:7); Doc. 94-10 at 3. Plaintiff further testified that, like Ms. Hiram, Mr. Gathages was allowed to take 30 days off work to travel to Africa and did not have to find a replacement. Doc. 93-1 at 21 (Pl.'s Dep. 118:8–12); Doc. 94-10 at 3.

The fourth co-worker plaintiff identifies is Marth Gatotho, an African woman. Doc. 93-1 at 21 (Pl.'s Dep. 118:13–16); Doc. 94-10 at 4. Plaintiff testified that Ms. Gatotho was not disciplined for refusing to work in certain halls and refusing to work at the Rapid Recovery Unit. Doc. 93-1 at 21–22 (Pl.'s Dep. 118:17–119:20); Doc. 94-10 at 3.

The fifth co-worker in the record is Tiara Taje. In her EEOC Intake Questionnaire, plaintiff wrote that Ms. Taje, an African American woman, "received no disciplinary actions when she walked off of the job after [plaintiff] asked her to work the Rapid Recovery Unit for about an hour until the next CNA arrived . . . . Leena [King-Alvoid] allowed her to come back to work. She was not disciplined for missing work, tardiness, or refusing assigned job tasks." Doc. 94-10 at 3.

The last co-worker identified in the summary judgment record is Taryn Harrell, an African American woman. In her EEOC Intake Questionnaire, plaintiff wrote that Ms. Harrell "received no disciplinary actions for refusing to do assigned tasks[,] . . . for tardiness, or for calling in and missing shifts." Doc. 94-10 at 3.

In sum, plaintiff alleges she was treated differently than six of her coworkers. Plaintiff was denied time off and had to find a replacement to cover her shift. Doc. 93-1 at 17–18 (Pl.'s Dep. 114:20–115:1).

In contrast, Ms. King-Alvoid testified that she "would hold everyone accountable." Doc. 95-1 at 3 (King-Alvoid Dep. 164:20–165:18). Ms. King-Alvoid directly disagreed with plaintiff's allegations that she treated plaintiff's coworkers better than she treated plaintiff. *Id.* at 1–8 (King-Alvoid Dep. 168:2–12, 170:18–171:17, 172:8–173:14). Ms. King-Alvoid testified that plaintiff would not know whether Ms. King-Alvoid had disciplined another employee. *Id.* at 5 (Pl.'s Dep. 171:20–23).

### The Rapid Recovery Unit

In addition to complaints about unfair treatment and discrimination, plaintiff complained to Ms. Bell about her assignment to the Rapid Recovery Unit.[6] Doc. 80-3 at 12–13 (Pl.'s Dep. 60:19–61:7). Ms. King-Alvoid, with Ms. Bell's involvement, made staffing assignments and did the scheduling.[7] Doc. 94-11 at 3–4 (Bell Dep. 46:14–47:15). Ms. Bell considered assignment to

---

[6]     The Rapid Recovery Unit is referred to differently throughout the record as "Rapid Recovery Unit" (Doc. 80-3 at 13 (Pl.'s Dep. 61:4–5)), "rapid recovery" (Doc. 80-6 at 6 (King-Alvoid Dep. 159:9–11)), and "rehab wing" (Doc. 80-5 at 16 (Bell Dep. 253:17–21)). The record shows indisputably that all these terms refer to the same place. Thus, the court refers to it throughout this opinion as the "Rapid Recovery Unit".

[7]     Defendants claim that Ms. King-Alvoid and Ms. Bell worked on the schedule "together." Doc. 79 at 4. Defendants cite Ms. Bell's deposition, Exhibit 18 (Doc. 80-5), at lines 45:12–48:16. Exhibit 18, submitted to support defendants' motion, only includes page 45 of Ms. Bell's deposition. Doc. 80-5 at 7. Page 45 includes Ms. Bell's statement that she "discussed assignments to the Rapid Recovery Unit and who was being assigned based on shift and based on capability with Leena [King-Alvoid][.]" Doc. 80-5 at 7 (Bell Dep. 45:18–23). Plaintiff argues that Ms. Bell did not participate in scheduling or Rapid Recovery Unit assignments while plaintiff was employed. Doc. 93 at 3–4 (¶¶ 16 & 19). To support this assertion, plaintiff cites pages 46 and 47 of Ms. Bell's deposition, two of the same pages defendants cited. *Id.* These pages, missing from defendants' Exhibit 18, purportedly include Ms. Bell's testimony that Ms. Bell was "very involved with the schedule" and "was always involved with the schedule." Doc. 94-11 at 3 (Bell Dep. 46:5–16). Ms. Bell testified that Ms. King-Alvoid completed a paper schedule and Ms. Bell "would help with staffing thereafter" because she is "a very involved administrator." *Id.* at 3–4 (Bell Dep. 46:22–47:15).

the Rapid Recovery Unit " a compliment."  Doc. 80-5 at 16 (Bell Dep. 253:17–21).  Ms. King-

Alvoid did not think that assignment to the Rapid Recovery Unit was a punishment.  Doc. 80-6

at 8–9 (King-Alvoid Dep. 198:17–199:3).  When asked about the Rapid Recovery Unit, Ms.

King-Alvoid testified, "I actually had some nurses who would . . . say, well, that's a cake walk in

there in comparison to working in healthcare, and even say, I have no problem going over there,

because that's a cake walk.  Those nurses have it easy."[8]  *Id.*  Plaintiff testified that she felt that

---

Applying the familiar standard, the summary judgment record supports plaintiff's assertion—that Ms. King-Alvoid made the schedule—because that is the operative fact viewed in the light most favorable to plaintiff.  *Id.* (Bell Dep. 46:22–47:8).  But, the evidence cited by plaintiff also shows that Ms. Bell was involved in scheduling during plaintiff's tenure.  *Id.* at 3 (Bell Dep. 46:14–21).  Thus, plaintiff's assertion that Ms. King-Alvoid was the only one involved in making the schedule is not supported by the summary judgment record.  Defendants' page 48 of Ms. Bell's deposition remains missing.

[8]     Plaintiff asserts that this statement—that other nurses would consider assignment to the Rapid Recovery Unit a "cake walk"—is inadmissible hearsay and speculation.  Doc. 93 at 4.  Plaintiff elaborates that the statement "is not admissible in evidence as non-hearsay as defined by [Fed. R. Evid.] 801(d)(2)(D) . . . ."  *Id.*  Fed. R. Evid. 801(d) defines certain statements as not hearsay.  Rule 801(d)(2) provides that certain statements made by an opposing party and offered against that opposing party are not hearsay and thus are admissible.  Rule 801(d)(2)(D) is specific to statements "made by the [opposing] party's agent or employee on a matter within the scope of that relationship . . . ."  In this case, the statement about the Rapid Recovery Unit being a "cakewalk" was made by Pioneer Ridge Nursing's employee, Ms. King-Alvoid.  And, the statement is offered by defendants.  Thus, this statement is not offered by the opposing party.  So, plaintiff is correct Rule 801(d)(2)(D) does not support admitting this statement.

The court construes the plaintiff's argument as a hearsay objection because Ms. King-Alvoid, the declarant, testified about statements by other nurses.  Additionally, plaintiff argues the statement is speculation.  Defendants respond that the statement "is not speculation, but is instead based on Ms. Alvoid's experience with nursing scheduling" and that the statement is not hearsay because "the statement is offered to demonstrate Ms. Alvoid's personal belief that an assignment to rapid recovery was not a punishment."  Doc. 95 at 3.

The Federal Rules of Evidence define hearsay as "a statement that:  (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence *to prove the truth of the matter asserted in the statement*."  Fed. R. Evid. 801(c) (emphasis added).  But, statements that are offered for purposes other than proving the truth of the matter asserted don't count as hearsay.  *See, e.g.*, *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434–35 (10th Cir. 1993) (holding that statements about job applicants' bad conduct wasn't hearsay because they weren't offered to prove the truth of the matter asserted but instead offered to establish the employer's state of mind when it decided not to hire applicants); *Allen v. Montgomery*, 728 F.2d 1409, 1412 (11th Cir. 1984) (recognizing that newspaper articles about jury sequestration during a criminal trial "were not objectionable as hearsay because they were not offered to prove the truth of the matter asserted—that the jury stayed with the sheriff" but instead were offered "to establish . . . pretrial publicity"); *Eaton v. Harsha*, 505 F. Supp. 2d 948, 952–53

assignments to the Rapid Recovery Unit were "belittling" because she was "a nurse, not a medication passer." Doc. 93-1 at 11 (Pl.'s Dep. 96:3–8).

### *Plaintiff's Termination*

On February 16, 2018, plaintiff was involved in an argument with a resident's son. Doc. 77 at 3 (Pretrial Order ¶ 2.a.5.). Both plaintiff and the resident's son raised their voices.[9] *Id.* Plaintiff testified that the argument began after the resident's son accused her of failing to assess the resident's vitals. Doc. 93-1 at 3–4 (Pl.'s Dep. 70:8–71:23). As plaintiff tried to address the son's concerns and provide care to the resident, the resident's son continued to interrogate

---

nn. 4 & 6 (D. Kan. 2007) (finding that statements made to a police chief by members of the public who had complained that two police officers had made offensive and racially insensitive comments were not hearsay because statements weren't offered to prove truth of the matters asserted by the complaints—*i.e.*, that the police officers' comments were offensive and racially insensitive—but instead to show that the police chief had received complaints from community members). In short, a statement offered to show its effect on the listener isn't hearsay because it isn't offered to prove the truth of the underlying matter asserted by the statement—*i.e.*, to prove the truth of the contents of the declarant's statement—but instead is offered to prove how the statement affected the person who heard the statement. *See United States v. Smalls*, 605 F.3d 765, 785 n.18 (10th Cir. 2010) (holding that statements weren't inadmissible hearsay when "they are not offered to prove the truth of the matter asserted, but rather are offered to establish their effect on [the listener] and provide context for his statement"); *see also Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007) (explaining that "a statement offered to show its effect on the person who heard the statement is not hearsay" (citing *United States v. Robinzine*, 80 F.3d 246, 252 (7th Cir. 1996)).

Here, defendants do not offer Ms. King-Alvoid's statement to prove its truth, *i.e.*, to prove that assignment to the Rapid Recovery Unit was, in fact, a "cake walk." Instead, defendants offer the statement to show the effect those statements had on Ms. King-Alvoid's understanding of the Rapid Recovery unit and her state of mind when she assigned employees, including plaintiff, to the Rapid Recovery Unit. Accordingly, the statement is not hearsay and is, therefore, admissible for the limited purpose it is offered.

Last, Ms. King-Alvoid's statement is not mere speculation. Again, the statement is not offered to prove that working in the Rapid Recovery Unit was a "cake walk." Instead, it is offered to show Ms. King-Alvoid's understanding of the Rapid Recovery Unit and her state of mind when assigning employees to the Rapid Recovery Unit. Ms. King-Alvoid certainly has personal knowledge of her own understanding and state of mind.

[9]      Plaintiff controverts this fact in part, arguing that the resident's son raised his voice first. Doc. 93 at 4, 12. This fact is taken from the Stipulations section of the Pretrial Order. Doc. 77 at 3 (Pretrial Order ¶ 2.a.5.). Plaintiff has not filed any motion to amend the Pretrial Order, so its stipulations stand. In any event, who raised whose voice first is immaterial to the issue here.

plaintiff.  *Id.* at 3–4 (Pl.'s Dep. 70:13–71:9).  Plaintiff left the room.  *Id.* at 4 (Pl.'s Dep. 71:10–

23).  Plaintiff's direct supervisor, Debbie Garrett, assessed the resident.  *Id.*  After discovering

that the resident's oxygen levels were low, the resident was transported to the emergency room

for treatment and later diagnosed with sepsis.  Doc. 81-8 at 2.

Pioneer Ridge Nursing is required to report allegations of abuse and neglect to the State

of Kansas.  Doc. 80-6 at 10–11 (King-Alvoid Dep. 200:13–201:4); Doc. 80-7 at 4 (Vogel Dep.

108:6–14).  "As a result of the resident's condition and [plaintiff's] acknowledgement of an

argument with the resident's son, and Pioneer Ridge Nursing's belief that [plaintiff] refused to

take the resident's vital signs, Pioneer Ridge Nursing reported an Allegation of Neglect to

Kansas Department of Aging and Disability Services ('KDADS')."  Doc. 77 at 3 (Pretrial Order

¶ 2.a.6.).  Plaintiff asserts that she never refused to take the resident's vital signs.  Doc. 93 at 5,

12.  Plaintiff was suspended while Pioneer Ridge Nursing investigated the Allegation of Neglect.

Doc. 77 at 3 (Pretrial Order ¶ 2.a.7.).

On February 22, 2018, Pioneer Ridge Nursing concluded its investigation and sent its

findings to KDADS:  Pioneer Ridge Nursing determined that the resident wasn't neglected and

the changes in the resident's condition were assessed and addressed timely.  Doc. 77 at 3

(Pretrial Order ¶ 2.a.8–9.).  Pioneer Ridge Nursing also reported to KDADS that it had

terminated plaintiff's employment for failing to meet a family member's reasonable request.  *Id.*

(Pretrial Order ¶ 2.a.10.).  The subsequent KDADS investigation is discussed in more detail in

the next section.

Ms. Bell terminated plaintiff's employment at Pioneer Ridge Nursing on February 22,

2018.  *Id.* (Pretrial Order ¶ 2.a.11.).  Ms. Bell consulted with Ms. King-Alvoid before

terminating plaintiff's employment.  Doc. 93-2 at 7, 8 (King-Alvoid Dep. 196:4–7, 202:1–5).

Ms. Bell and Ms. King-Alvoid both attended plaintiff's termination meeting.  Doc. 80-3 at 5–6 (Pl.'s Dep. 45:2–46:7).  Ms. Bell did not need anyone else's approval or permission to terminate plaintiff.  *Id.* (Pretrial Order ¶ 2.a.11.).  "The stated reason for [plaintiff's] termination was that she neglected patient care duties related to the health and physical comfort of a resident when she failed to follow a reasonable request from a family member related to the care of his father and when she conducted herself unprofessionally in a manner that adversely effected the facility."[10] *Id.* (Pretrial Order ¶ 2.a.12.) (internal quotations omitted).  Ms. Bell testified that if plaintiff had not had these interactions with the resident and the resident's son, plaintiff likely still would be employed by defendant.  Doc. 80-5 at 14 (Bell Dep. 251:20–24).

Pioneer Ridge Nursing submitted an "Alleged Perpetrator Information Form" to KDADS. Doc 93-2 at 4–5 (King-Alvoid Dep. 24:4–25:21); Doc. 93-4.  It listed an outdated address for plaintiff on the Alleged Perpetrator Information Form.  Doc. 93-1 at 5–6 (Pl.'s Dep. 80:10–81:2). But Pioneer Ridge Nursing had record of plaintiff's current street address, as listed on her direct deposit paycheck.  Doc. 93-13 at 2.  Either Ms. Bell or Ms. King-Alvoid completed the portion of the Form listing plaintiff's address.  Doc 93-2 at 6 (King-Alvoid Dep. 32:1–24); Doc. 77 at 3 (Pretrial Order ¶ 2.a.4.).

---

[10]     Plaintiff controverts this as the reason for her termination, expanding the universe of possibilities to eight potential reasons for termination.  Doc. 93 at 6–7, 13.  But, the parties stipulated to the stated reason for plaintiff's termination in the Pretrial Order.  Doc. 77 at 3 (Pretrial Order ¶ 2.a.12).  Under D. Kan. Rule 16.2(b), an approved and filed pretrial order "will control the subsequent course of the action unless modified[.]"  *See also Hullman v. Bd. of Trs. of Pratt Cmty. Coll.*, 950 F.2d 665, 667 (10th Cir. 1991) ("The pretrial order supersedes the pleadings and controls the subsequent course of litigation.").  Again, plaintiff has not moved to modify the Pretrial Order.

### *KDADS Investigation*

"KDADS conducted its own investigation and reviewed the notarized statements of two witnesses employed by Pioneer Ridge Nursing[.]"[11]  Doc. 77 at 3 (Pretrial Order ¶ 2.a.14.).  The KDADS investigation found Abuse and Neglect under Kan. Stat. Ann. §§ 39-1401(f)(1), (f)(7),[12] and (g).  *Id.* (Pretrial Order ¶ 2.a.15.); Doc. 94-1 at 2, 5.  The "Notice of Finding of Abuse and Neglect" is dated October 25, 2018.  Doc. 94-1 at 2.

KDADS's Notice explained to plaintiff that she could appeal the "proposed finding by requesting a hearing . . . within 30 days"  and if she did not respond within 30 days, the proposed action would become "a final order confirming the finding."  Doc. 94-1 at 5.  The Notice further provided that KDADS would enter the final order onto the Nurse Aide Registry and that federal law prohibits nursing facilities from employing individuals "who have . . . had a finding entered

---

[11]     Defendants assert that "KDADS conducted its own independent investigation[.]"  Doc. 79 at 8.  Plaintiff controverts this statement, arguing, "KDADS' finding was not based on [its] independent investigation" and citing Pretrial Order Stipulated Fact 15.  Doc. 93 at 8.  But Pretrial Order Stipulated Fact 15 merely says, "KDADS's investigation."  Doc. 77 at 3 (Pretrial Order ¶ 2.a.15.).  Instead, Pretrial Order Stipulated Fact 14 stipulates, "KDADS conducted its own investigation."  *Id.* (Pretrial Order ¶ 2.a.14.).  The court must resolve the difference between KDADS conducting "its own investigation," as stipulated in the Pretrial Order, versus conducting "its own independent investigation," as asserted by defendants in their motion, in the light most favorable to plaintiff.  Thus, the court will use the language the parties stipulated to in the Pretrial Order:  "KDADS conducted its own investigation."  *Id.*

        Though KDADS conducted its own investigation, the Notice does not describe or cite documents or other evidence beyond what Pioneer Ridge Nursing supplied to KDADS.  *See* Doc. 94-1.

[12]     Though immaterial to the summary judgment issues, the court must resolve some confusion.  The Pretrial Order stipulates that Abuse and Neglect was found, in part, under Kan. Stat. Ann. § 39-1401(f)(5).  Doc. 77 at 3 (Pretrial Order ¶ 2.a.15.).  Document 94-1 (Exhibit 42) is the Notice of Finding of Abuse and Neglect from KDADS.  Page 2 of Document 94-1 provides that KDADS found abuse under Kan. Stat. Ann. § 39-1401(f)(7):  "omission or deprivation by a caretaker or another person of goods or services which are necessary to avoid physical or mental harm or illness."  Doc. 94-1 at 2.  Page 5 of Document 94-1 recites that KDADS found abuse under Kan. Stat. Ann. § 39-1401(f)(5).  But it appears that this is a typographical error.  *See* Kan. Stat. Ann. § 39-1401(f)(5) (defining abuse as "a threat or menacing conduct . . . .").  The stipulation in the Pretrial Order appears to have used page five of Document 94-1.  The court notes this discrepancy but follows the Pretrial Order, because it controls.  And in any event, this apparent discrepancy is immaterial to the court's summary judgment analysis.

into the state nurse aide registry concerning abuse, neglect, mistreatment of residents or

misappropriation of their property." *Id.* at 5–6.

  The Notice was sent to the last known address on file with the Kansas Nurse Aid

Registry.[13]  Doc. 81-14 at 1; Doc. 80-3 at 15 (Pl.'s Dep. 141:7–14).  However, plaintiff did not

know about the KDADS findings in the Notice until many months after KDADS had made the

findings.  Doc. 94-5; Doc. 93-1 at 7–8 (Pl.'s Dep. 88:2–89:19).  In a state court proceeding where

plaintiff petitioned for judicial review of the notice, the District Court of Shawnee County,

Kansas held that the Notice never ripened into a final order because KDADS had not served

plaintiff properly.[14]  Doc. 94-3.

  Nevertheless, plaintiff's name was entered on the Nurse Aide Registry with an

"Employment Prohibition on File."  Doc. 94-2 at 2.  Also, plaintiff's name appeared on the

Survey, Certification and Credentialing Commission website showing that plaintiff was

responsible for abuse and neglect to "residents in adult care homes[.]"  Doc. 94-4 at 2, 4.

  Now, based on this collection of the summary judgment facts, the court can address

plaintiff's legal claims.

---

[13] The parties' filings indicate some confusion about exhibit numbers.  Doc. 79 at 8; Doc. 93 at 8.
The exhibit cited by defendants, Exhibit 14, is plaintiff's deposition, in which she testified that the notice
was sent to the last known address on file with the Kansas Nurse Aide Registry.  Doc. 80-3 at 15 (Pl.'s
Dep. 141:7–14).  Plaintiff presumed the reference was "to Exhibit 5 of the Painter deposition."  Doc. 93 at
8.  The court does not know which exhibit was Exhibit 5 to plaintiff's deposition, it only knows that
defendants cited Exhibit 14 and Exhibit 14 supports defendants' statement of undisputed fact.  Doc. 80-3
at 15 (Pl.'s Dep. 141:7–14).

[14] The court takes judicial notice of this fact under Fed. R. Evid. 201(c)(2) following plaintiff's
request that the court take judicial notice of plaintiff's state court case.  Doc. 93 at 21.  Plaintiff cites
Exhibit 44 (Doc. 94-3), a copy of the memorandum and order issued by the Honorable Mary E.
Christopher.  The court may take judicial notice of this fact.  *See, e.g.*, *Gee v. Pacheco*, 627 F.3d 1178,
1194 (10th Cir. 2010) (holding that a district court properly considered records from another lawsuit on a
Rule 12(b)(6) motion to dismiss); *see also St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172
(10th Cir. 1979) (explaining that "federal courts, in appropriate circumstances, may take [judicial] notice
of proceedings in other courts, both within and without the federal judicial system, if those proceedings
have a direct relation to matters at issue").

## II.   Legal Standard

### A.   Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When the court applies this standard, it views the evidence and draws reasonable inferences in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  But the court "need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it."  *Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*, 864 F.3d 1154, 1173 (10th Cir. 2017).  An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]"  *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion[.]"  *Celotex Corp.*, 477 U.S. at 323; *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (explaining that the moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law'" (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002))).  A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp.*, 477 U.S. at 325; *see also Kannady*, 590 F.3d at 1169 (explaining that, to meet its summary judgment burden, the moving party "need not negate the non-movant's claim, but need

only point to an absence of evidence to support the non-movant's claim" (citation and internal quotation marks omitted)).

If the moving party satisfies its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted); *see also Kannady*, 590 F.3d at 1169 ("If the movant carries [the] initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." (citation and internal quotation marks omitted)). To satisfy this requirement, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (citation and internal quotation marks omitted). When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Summary judgment is not a "disfavored procedural shortcut[.]" *Celotex Corp.*, 477 U.S. at 327. Instead, summary judgment is an important procedure "designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1 (further citation omitted)).

## III.   Discussion

As already recited, plaintiff asserts five distinct claims. Counts I and III claim that defendants discriminated against her based on her race when terminating her employment. These two claims invoke Title VII and § 1981. Doc. 77 at 9. *Second*, in Counts II and IV, Ms.

Painter asserts that defendants retaliated against her for making race discrimination complaints, thus violating Title VII and § 1981. *Id.  Third*, Count V contends that defendants tortiously interfered with her prospective contractual relationships or expectancies in the form of employment with other employers who offer nursing facility services. *Id.  Last*, Count VI asserts that defendants blacklisted her, violating Kan. Stat. Ann. §§ 44-117 and 44-119. *Id.*

The court addresses each claim in turn, below.  But, first, the court begins with a threshold question:  are plaintiff's claims time-barred?

### A.      Whether Plaintiff's Claims are Time-Barred

Plaintiff's employment terminated on February 22, 2018.  She filed this action on June 22, 2019 (Doc. 1).  And, she added Pioneer Ridge Nursing as a defendant with the Third Amended Complaint (Doc. 61), filed on September 10, 2020.  Defendants argue that plaintiff's Title VII claims and her Kansas common law claims are time-barred.  Doc. 79 at 27–28; Doc. 95 at 20–21.  The court discusses the statute of limitations for each cause of action, below.[15]  But, first, the court must determine the operative date of plaintiff's Complaint.  Specifically, does plaintiff's Third Amended Complaint relate back to the filing of her original Complaint?

### 1.   Whether Plaintiff's Third Amended Complaint Relates Back

Plaintiff asks the court to treat her Third Amended Complaint (Doc. 61) as one that relates back to the date she filed her original Complaint (Doc. 1) for purposes of the statute of limitations governing her claims against defendant Pioneer Ridge Nursing.  "Relation back" is governed by Fed. R. Civ. P. 15.  Specifically, Fed. R. Civ. P. 15(c)(1)(C) provides:

> An amendment to a pleading relates back to the date of the original pleading when . . . the amendment changes the party or the naming of the party against

---

[15]      This subsection discusses whether the Third Amended Complaint Relates back to the original Complaint under Fed. R. Civ. P. 15.  Then, this section addresses whether the relation back doctrine makes plaintiff's Title VII claims timely under the statute of limitations.  The court addresses the timeliness of plaintiff's Kansas state law claims later in this order.  *See infra* Parts III.F. & G.

whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:  (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the property party's identity.

Fed. R. Civ. P. 15(c)(1)(B) requires that "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]"  Fed. R. Civ. P. 15(c)(1)(B).  Rule 4(m) establishes a 90-day time limit for service.

So, for the Third Amendment Complaint to relate back to her original Complaint, plaintiff must satisfy three requirements:  (1) Rule 15(c)(1)(B)'s requirement that the amendment arise out of the same conduct, transaction, or occurrence set out in the original pleading; (2) the new defendant (Pioneer Ridge Nursing) must have received "notice" within 90 days; and (3) within 90 days, the new defendant (Pioneer Ridge Nursing) "knew or should have known that the action would have been brought against it, but for a mistake concerning the property party's identity."  Fed. R. Civ. P. 15(c)(1)(C).  Defendants focus the argument on the third element. Doc. 79 at 27–28.

The Supreme Court articulated the proper test for this Rule 15(c)(1)(C)(ii) "mistake" requirement in *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538 (2010).  The relevant inquiry is "what the prospective *defendant* knew or should have known . . . not what the *plaintiff* knew or should have known at the time of filing her original complaint."  *Id.* at 548 (emphasis in original).  The plaintiff's knowledge becomes relevant, however, "if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity."  *Id.* "[M]aking a deliberate choice to sue one party instead of another while fully understanding the factual and legal difference between the two parties is the antithesis of making a mistake

20

concerning the proper party's identity." *Id.* at 549; *see also Grider v. Shawnee Mission Med.*

*Ctr., Inc.*, No. 16-2750-DDC-GLR, 2017 WL 2971967, at *4 (D. Kan. July 12, 2017).  Still,

> [t]hat a plaintiff knows of a party's existence does not preclude her from making a mistake with respect to that party's identity. . . .  [A] plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the conduct, transaction, or occurrence giving rise to her claim.  If the plaintiff sues party B instead of Party A under these circumstances, she has a made a mistake concerning the proper party's identity notwithstanding her knowledge of the existence of both parties.

*Krupski*, 560 U.S. at 549 (internal quotations omitted).

Here, defendants argue that plaintiff made no mistake about defendant Pioneer Ridge's

identity.  Doc. 79 at 28.  Defendants assert that plaintiff deliberately chose to sue Midwest

Health instead of Pioneer Ridge Nursing and "fastidiously clung to her incorrect assertion that

Midwest Health does business as Pioneer Ridge Nursing." *Id.*  Plaintiff disagrees.  She argues

that Midwest Health obfuscated the identity of the "Pioneer Ridge Nursing" entity that employed

plaintiff.  Doc. 93 at 46–49.

After reviewing the record, the court concludes that, while plaintiff knew generally what

Pioneer Ridge Nursing does, plaintiff did not fully understand the factual and legal difference

between Midwest Health and Pioneer Ridge Nursing.  Plaintiff's original Complaint named

"Midwest Health, Inc., d/b/a Pioneer Ridge Health and Rehabilitation" as the lone defendant.

Doc. 1.  Defendants contend that they informed plaintiff that Midwest Health was not plaintiff's

employer in two Answers and a letter to plaintiff's counsel.  Doc. 79 at 28.  The court examines,

below, each of these documents.

Midwest Health's first Answer denied that Midwest Health did business as Pioneer Ridge

Health and Rehabilitation and declared that plaintiff "was performing as an LPN . . . at Pioneer

Ridge Health and Rehabilitation [at] the time of her termination . . . ."  Doc. 14 at 2, 7.  Midwest

Health's second Answer said the same thing.  Doc. 17 at 2, 7.  Defense counsel's correspondence named plaintiff's employer as "Pioneer Ridge Nursing Facility."  Doc. 93-7 at 2.  The problem is that neither of the entities named by Midwest Health—Pioneer Ridge Health and Rehabilitation nor Pioneer Ridge Nursing Facility—exists.  Doc. 93-8 at 2.  Even Midwest Health's interrogatory responses named nonexistent entities as plaintiff's employer:  "Pioneer Ridge" and "Pioneer Ridge Nursing Facility."  Doc. 93-9 at 3–6; Doc. 93-8 at 2.

It is easy to see how this could have bewildered plaintiff.  Only when plaintiff deposed Ms. Sourk, Midwest Health's corporate representative, did she learn that "Pioneer Ridge Nursing Facility Operations, LLC" is the corporate entity who employed plaintiff.  Doc. 93-5 at 6 (Sourk Dep. 63:15–19).

The court agrees with United States Magistrate Judge Mitchell:  plaintiff "did not receive accurate information" about "the specific business entity that Midwest Health contends is her true employer until July 28[, 2020.]"  Doc. 55 at 5.  Before July 2020, plaintiff, at best, had "conflicting and inaccurate information about the name of the defendant entity prior to filing this lawsuit." *Id.* at 6.  This case falls squarely within the scenario spelled out by the Court in *Krupski*:  "[A] plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the conduct, transaction, or occurrence giving rise to her claim." 560 U.S. at 549.  Here, the record shows that plaintiff made a mistake about the proper party's identity.  She didn't make a tactical or deliberate decision because she did not fully understand the factual and legal difference between the entities.

Defendants' authority for their argument is unpersuasive.  *First*, they cite *Silva v. Ekis*, but *Silva* involves relation back against a Doe defendant, a different factual scenario.  No. 15-3007, 2018 WL 1456523, at *3 (D. Kan. Mar. 23, 2018).  *Second*, they cite *McGregor v. Snyder*

to show that plaintiff did not make a mistake because she was informed multiple times that Midwest Health was not her employer.  427 F. App'x 629 (10th Cir. 2011).  In that case, our Circuit affirmed a district court's decision not to allow relate back because plaintiff was "unquestionably aware of the identity and involvement" of the later-added defendants since the date of the incident.  *Id.* at 632.  Here, the record establishes that plaintiff was not "unquestionably aware of the identity and involvement" of Pioneer Ridge Nursing.  Defendants' attempts to inform plaintiff about the identity of the Pioneer Ridge Nursing entity did not clear up the confusion.  To the contrary, by referring to other, non-existent business entities, they may have created even more confusion.  *Last*, defendants cite *Grider v. Shawnee Mission Medical Center, Inc.*, where plaintiffs sought to add a doctor as a defendant in a medical malpractice suit. No. 17-2750-DDC-GLR, 2017 WL 2971967 (D. Kan. July 12, 2017).  United States Magistrate Judge Rushfelt declined to apply the relation back doctrine in *Grider* because the plaintiffs did not make a mistake:  they made a tactical decision to sue a corporation rather than the doctor, its employee.  *Id.* at *4.  Judge Rushfelt elaborated, "[i]ndeed, unlike *Krupski*, Plaintiffs have not confused two entities with similar names."  *Id.*  In this lawsuit, confusion about the right entity to sue prevailed.  And defendant Midwest Health caused some of it.  This case is like *Krupski*, not *Grider*.

The court holds that plaintiff's Third Amended Complaint relates back to the date of the original Complaint.  The court thus will consider all claims asserted against Pioneer Ridge Nursing as if filed on June 22, 2019.  Next, in subsection two, the court applies the relevant statute of limitations to plaintiff's Title VII claims (defendants do not contend the § 1981 claims are untimely).

### 2.   Whether Plaintiff's Title VII Claims are Time-Barred Against Pioneer Ridge Nursing

To assert a timely Title VII claim, a plaintiff must file suit within 90 days of receiving a right-to-sue notice from the United States Equal Employment Opportunity Commission (EEOC). 42 U.S.C. § 2000e-5(f)(1). The EEOC issued a "Dismissal and Notice of Rights" to plaintiff on March 27, 2019. Doc. 61 at 2; Doc. 66 at 2. Plaintiff filed her original Complaint on June 22, 2019. Doc. 1. Since plaintiff's Third Amended Complaint (Doc. 61) relates back to the original Complaint, she filed her Title VII claims against Pioneer Ridge Nursing within the 90-day statute of limitations.

With the timing issues decided, the court next addresses defendants' substantive attacks on plaintiff's Title VII claims.

### B.   Whether Midwest Health Deserves Summary Judgment Against Plaintiff's Claims Because the Summary Judgment Facts Present No Triable Issue Whether Midwest Health Was Plaintiff's Employer

To make a prima facie case of discrimination or retaliation under Title VII, plaintiff first must prove that Midwest Health was her employer. *Knitter v. Corvias Mil. Living, LLC*, 758 F.3d 1214, 1225 (10th Cir. 2014). Defendant Midwest Health asserts that it is entitled to summary judgment because it was never plaintiff's employer. Doc. 79 at 13–16. Plaintiff responds that Midwest Health is her employer for purposes of her employment discrimination claims. Doc. 93 at 24–25. The court agrees with defendants that plaintiff has failed to adduce admissible evidence capable of supporting a finding that Midwest Health was her employer.

"Factfinders must decide whether a defendant is an employer for purposes of Title VII when doubts exist as to (1) whether a plaintiff is an employee or an independent contractor, or, alternatively, (2) which one(s) of multiple individuals or entities is (are) the plaintiff's employer." *Knitter*, 758 F.3d at 1225 (10th Cir. 2014) (citing *Bristol v. Bd. of Cnty. Comm'rs of*

*Clear Creek*, 312 F.3d 1213, 1217–18 (10th Cir. 2002) (en banc)).  While the governing law

generally assigns this question to the factfinder, the court nonetheless may decide this question

on summary judgment "to determine whether a reasonable jury could find" that plaintiff has

assembled admissible evidence capable of supporting a finding that Midwest Health was

plaintiff's employer under these tests.  *Id.* at 1227.

"Depending on the situation, [our] circuit chooses among three different tests to

determine whether a defendant is an employer depending on the situation:  (i) the hybrid test; (ii)

the joint employer test; and (iii) the single employer test." *Id.* at 1225–26.  Plaintiff relies on two

of the three tests to support her claim that Midwest Health was plaintiff's employer:  the single

employer test and the joint employer test.  Doc. 93 at 24–26.

### 1.   Whether Defendants Satisfy the Single Employer Test

"[T]he single employer test permits a plaintiff who is the employee of one entity . . . to

hold another entity liable by arguing that the two entities effectively constitute a single

employer." *Knitter*, 758 F.3d at 1226 (citations and internal quotations omitted).  "Unlike the

joint employer test, which focuses on the relationship between an employee and its two potential

employers, the single employer test focuses on the relationship between the potential employers

themselves." *Id.* at 1227.  "Courts applying the single-employer test generally weigh four

factors:  (1) interrelations of operation; (2) common management; (3) centralized control of labor

relations; and (4) common ownership and financial control." *Id.* (citation and internal quotation

marks omitted).  The third factor is the most important one.  *Sandoval v. City of Boulder, Colo.*,

388 F.3d 1312, 1322 (10th Cir. 2004); *Bristol*, 312 F.3d at 1220.

*Florez v. Holly Corp*. provides a useful illustration of how our Circuit applies this test.

154 F. App'x 707 (10th Cir. 2005).  In that case, the plaintiff worked as an employee of a

subsidiary seeking to hold the parent company liable under the single employer test.  *Id.* at 708.

Plaintiff cited several connections between the parent, Holly Corporation, and the subsidiary,

Navajo Refining Company:

> Navajo is a wholly owned subsidiary of Holly.  One individual serves as president
> of both companies.  Holly's Dallas office houses one Navajo employee and
> Navajo's refinery houses one of Holly's employees.  Holly provides administrative
> support to its subsidiaries.  Finally, [plaintiff] states that Holly mandates random
> drug testing for the employees of its subsidiaries, that Holly manages its
> subsidiaries' employment benefit plans, and that, at one time, Holly employed
> several employees of Navajo.

*Id.* at 708–09.  Our Circuit held these facts insufficient to satisfy the single employer test.  *Id.* at

709.

As *Florez* did, the court here must analyze each factor, then aggregate the results.

### a.  Factor One:  Interrelations of Operation

For the first factor, interrelations of operation, plaintiff argues that "the Management

Agreement reflects a thorough interweaving of corporate rights and duties."  Doc. 93 at 25.  The

Management Agreement requires Midwest Health to provide "specialized services" to Pioneer

Ridge Nursing, specifically:  financing, accounts receivable, accounts payable, requisition of

supplies, maintenance, financial reports, income tax returns, developer services, legal services,

and "fringe benefits."  Doc. 93-11 at 2–6.  Also, Pioneer Ridge Nursing promoted itself as a

"Proud Member of Midwest Health Family of Communities" and Midwest Health posted Pioneer

Ridge Nursing jobs on Midwest Health's Facebook page.  This first factor favors plaintiff.

### b.  Factor Two:  Common Management

The second factor is common management.  In *Florez*, our Circuit held that "the mere

existence of a single common manager or officer is not sufficient to establish a disputed material

fact concerning the common management element."  *Florez v. Holly Corp.*, 145 F. App'x 707,

709 (10th Cir. 2005).  In *Frank v. U.S. West, Inc.*, the Circuit listed circumstances when the

common management element existed:  common presidents, common officers, overlapping

officers and directors, and the same family heading both the parent company and the subsidiary.

3 F.3d 1357, 1364 (10th Cir. 1993).  Thus, the appropriate inquiry under this factor is whether

the two entities have common company presidents, directors, officers, or managers.

Plaintiff again cites the Management Agreement between Pioneer Ridge Nursing and

Midwest Health.  Doc. 93 at 25.  Though called a "Management Agreement," the agreement

focuses on financing, accounts receivable, accounts payable, requisition of supplies,

maintenance, financial reports, income tax returns, developer services, legal services, and "fringe

benefits."  Doc. 93-11 at 2–6.  The Management Agreement does not identify or even mention

company presidents, directors, officers, or managers.  Beyond the Management Agreement, the

only mention of officers in the summary judgment record involves Floyd C. Eaton Jr., who

serves as an officer of Pioneer Ridge Nursing and is a shareholder of Midwest Health.  Doc. 93-5

at 9 (Sourk Dep. 64:7–16).  This fact is not sufficient to establish a triable issue of common

management.  The second factor of the single employer test, even when viewed in a light most

favorable to plaintiff, favors defendants.

### c.  Factor Three:  Centralized Control of Labor Relations

The third factor is centralized control of labor relations.  This factor is the most important

one.  *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1322 (10th Cir. 2004); *Bristol*, 312 F.3d

at 1220 ("courts have focused almost exclusively on one question:  which entity made the final

decisions regarding employment matters relating to the person claiming discrimination?").  The

critical inquiry is "what entity made the final decisions regarding employment matters related to

the person claiming discrimination?"  *Frank*, 3 F.3d at 1363 (citation, internal quotation marks,

and internal brackets omitted); *see also Bristol*, 312 F.3d at 1220.  The most important aspect of an entity's control over employment matters is the right to terminate employment.  *Sandoval*, 388 F.3d at 1323.

Plaintiff argues "there is at least some evidence of centralized control of labor relations." Doc. 93 at 25.  And indeed, Midwest Health appears to have a hand in payroll and health insurance for Pioneer Ridge employees.  *See* Doc. 93-15 at 2 ("Deposit ACH MWH INCPOOLED"); Doc. 93-16 at 2 ("Group Name:  MIDWEST HEALTH MGMT INC").  On its Facebook page, Midwest Health, Inc. posted jobs available at Pioneer Ridge Health & Rehab. Doc. 95 at 17.  Midwest Health "staff members" were available for "consultation" if a Pioneer Ridge Nursing "supervisor or . . . administrator" had questions about human resources.  Doc. 93-5 at 12 (Sourk Dep. 88:10–19).  Midwest Health consults with Pioneer Ridge Nursing on its employee handbook but does not provide the exact handbook it uses.  *Id.* at 3 (Sourk Dep. 18:1–23).  Ms. Vogel, Midwest Health's Vice President of Skilled Nursing Facilities, is involved in hiring decisions "if administrators have questions on qualifications," but is not routinely involved with hiring  Doc. 93-6 at 3, 5 (Vogel Dep. 12:19–24, 93:9–24).  Critically, Midwest Health does not otherwise participate in Pioneer Ridge Nursing's hiring and firing decisions. Doc. 93-5 at 12 (Sourk Dep. 88:10–19).

These facts fall short of "centralized control of labor relations."  At most, Midwest Health was involved in limited aspects of Pioneer Ridge Nursing hiring decisions, was consulted on the employee handbook and with occasional human resources questions, provided plaintiff with health insurance, and handled some aspects of payroll.  These facts do not amount to final decisions about plaintiff's employment matters.  And, the most critical piece of this third

factor—the right to terminate—is missing.  Thus, even when viewed in a light most favorable to

plaintiff, the third factor favors defendants.

### d.  Factor Four:  Common Ownership and Financial Control

The last factor is common ownership and financial control.  "The common ownership or

financial control factor is the least important."  *Spicer v. Radnet, Inc.*, No. 10-4024-MLB, 2010

WL 5301017, at *7 (D. Kan. Dec. 20, 2010) (quoting *Tatum v. Everhart*, 954 F. Supp. 225, 229

(D. Kan. 1997) (citing *Eichenwald v. Krigel's, Inc.*, 908 F. Supp. 1531, 1541 (D. Kan. 1995)

(citing *NLRB v. Welcome-Am. Fertilizer Co.*, 443 F.2d 19, 20–21 (9th Cir. 1971)))).

Plaintiff's evidence of common ownership, viewed in the light most favorable to her,

shows that James A. Klausman is a shareholder of Midwest Health and trusts bearing the names

of his two children are two of the four owners of Clayton Enterprises, LLC, and Clayton

Enterprises, LLC owns Pioneer Ridge Nursing.  Doc. 93-5 at 8–10 (Sourk Dep. 62:17–64:16).  A

shareholder of Midwest Health, Inc. is an officer of Pioneer Ridge Nursing Facility Operations,

LLC.  Doc. 93-5 at 10 (Sourk Dep. 64:7–16).  And, the same individual, James A. Klausman,

signed a Management Agreement between the two entities, signing as Midwest Health, Inc.'s

President and as Pioneer Ridge Nursing Facility Operations, LLC's Duly Authorized Agent.

Doc. 93-11 at 9.  That individual, James A. Klausman, has sole discretion over the modification

and performance of the Management Agreement.  Doc. 94-6 at 4–5 (Klausman Dep. 22:23–

23:2).

Plaintiff's evidence does not create a triable issue on this fourth factor.  Plaintiff cites

evidence of Pioneer Ridge Nursing's ownership:  an LLC owned by four trusts, two of which

bear the names of James A. Klausman's sons.  But, trusts are their own entities[16]—and James B.

---

[16]     "A trust . . . is a fiduciary relationship with respect to property, arising from a manifestation of
intent to create that relationship and subjecting the person who holds title to the property to duties to deal

Klausman and Michael Klausman are not James A. Klausman.  Critically, plaintiff hasn't established that Pioneer Ridge Nursing's ownership overlaps with Midwest Health's ownership because the summary judgment record contains no evidence about Midwest Health's ownership.

James A. Klausman signed the Management Agreement for both Midwest Health and Pioneer Ridge Nursing but this does not create a triable issue.  The court doesn't need to speculate about James A. Klausman's role.  The summary judgment facts explain James A. Klausman's connection to both Midwest Health and Pioneer Ridge Nursing:  he is a shareholder of Midwest Health and, when the Management Agreement was signed, he was Pioneer Ridge Nursing's Duly Authorized Agent and Midwest Health's President.  Plaintiff has adduced no evidence that James A. Klausman holds any ownership in Pioneer Ridge Nursing.  No reasonable factfinder could conclude that Pioneer Ridge Nursing and Midwest Health had common ownership.

The same is true of financial control.  Plaintiff hasn't adduced any evidence or even argued that Midwest Health controlled Pioneer Ridge Nursing's finances.  Plaintiff has not created a triable issue of fact about this fourth factor.  It favors defendants.

### e.  Weighing the Four Single Employment Test Factors

The court concludes that factor one favors plaintiff but factors two, three, and four favor defendants.  And, the third factor is the most important.  *Sandoval*, 388 F.3d at 1322.  Applying the single employer test, the summary judgment facts will not permit a reasonable juror to find that Midwest Health and Pioneer Ridge, in effect, amounted to a "single employer" under this standard.  *See Knitter*, 758 F.3d at 1226.

---

with it . . . for one or more persons[.]"  Restatement (Third) of Trusts § 2 (Am. L. Inst. 2003).  "Increasingly, modern common-law and statutory concepts and terminology tacitly recognize the trust as a legal 'entity,' consisting of the trust estate and the associated fiduciary relation between the trustee and the beneficiaries."  *Id.* § 2 cmt. a.

A global comparison with *Florez* offers a useful illustration.  The two entities in *Florez* involved a wholly owned subsidiary, a common president, each entity had an employee of the other entity in their respective offices, the parent provided administrative support, parent gave broad mandates to the subsidiary, management of benefit plans, and mingled employment. *Florez*, 154 F. App'x at 708–09.  Our Circuit held these facts did not present a genuine, triable issue whether the two entities functioned as a single employer.  Comparatively, Midwest Health and Pioneer Ridge Nursing are even less integrated than the *Florez* entities.  The court thus holds that the summary judgment facts present no jury question whether Midwest Health and Pioneer Ridge Nursing constitute a single employer.

### 2.  Whether Defendants Satisfy the Joint Employer Test

The second test invoked by plaintiff is the joint employer test.  It is an "appropriate test to use when an employee of one entity seeks to hold another entity liable as an employer."  *Knitter*, 758 F.3d at 1226 (citing *Bristol*, 312 F.3d at 1218).  Unlike the single employer test, which "asks whether two nominally separate entities should in fact be treated as an integrated enterprise," the joint employer test "assumes that the alleged employers are separate entities."  *Sandoval*, 388 F.3d at 1323.

"Under the joint employer test, two entities are considered joint employers if they share or co-determine those matters governing the essential terms and conditions of employment.  Both entities are employers if they both exercise significant control over the same employees." *Knitter*, 758 F.3d at 1226 (internal quotation marks and citations omitted).  The joint employer test considers five factors:  (1) the right to terminate employment, (2) the ability to "promulgate work rules and assignments," (3) the ability to "set conditions of employment, including compensation, benefits, and hours," (4) "day-to-day supervision of employees, including

31

employee discipline," and (5) "control of employee records, including payroll, insurance, taxes and the like." *Id.* (citation and internal quotation marks omitted). The first factor, the right to terminate, is the most important factor. *Id.*

Plaintiff argues that the summary judgment facts present a triable issue under the joint employer test because "the parties' Management Agreement sets forth extensive connections between the two entities," and there exists some "interlocking functions in ownership and officers with the same individuals, or family members, owning and serving both entities." Doc. 93 at 24. Unfortunately, for plaintiff, common ownership and officers are not factors considered by the joint employer analysis. Therefore, the court applies the five factors to plaintiff's arguments based on the Management Agreement.

Under the Management Agreement, Midwest Health provides Pioneer Ridge Nursing with financing, accounts receivable, accounts payable, requisition of supplies, maintenance, financial reports, income tax returns, developer services, legal services, and "fringe benefits." Doc. 93-11 at 2–6. Accounts receivable includes payroll. *Id.* at 4–5. Fringe benefits includes health insurance. *Id.* at 6. Midwest Health also provides Pioneer Ridge Nursing with income tax services. *Id.* at 5. Considering these facts in the light most favorable to plaintiff, Midwest Health controls payroll, insurance, taxes, and more, amounting to control of employee records. Thus, factor five—control of employee records—favors plaintiff.

Separately, a reasonable factfinder could find that, because Midwest Health provides "fringe benefits"[17] to Pioneer Ridge Nursing employees, the third factor— the ability to set conditions of employment, including compensation, benefits, and hours—also favors plaintiff.

---

[17]    Under the Management Agreement, "fringe benefits" includes personnel services, counseling, health insurance, retirement benefits, and other possible qualified benefits for Pioneer Ridge Nursing Employees. Doc. 93-11 at 6.

Even so, the other three factors—including the most important first one, right to terminate—all favor defendants.  Plaintiff has adduced no admissible evidence that Midwest Health co-determined matters governing the essential terms and conditions of employment.  To the contrary, the undisputed facts establish that Pioneer Ridge Nursing controlled plaintiff's staffing, performance reviews, time-off requests, scheduling, discipline, and termination.  In sum, the summary judgment facts present no triable issues under the first, second, and fourth factors of the joint employer test.  Given plaintiff's failure to adduce evidence on these three factors, the court concludes as a matter of law that she may not hold Midwest Health liable as an employer under the joint employer test.

### 3.  Midwest Health Was Not Plaintiff's Employer

In sum, plaintiff has invoked two distinct tests trying to show that Midwest Health was her employer.  She has not carried her burden to establish a genuine dispute under either test.  The court holds that judgment is warranted as a matter of law against plaintiff's claim that Midwest Health was her employer.  This conclusion means she cannot prevail on her Title VII and § 1981 claims against that entity.  This is so because an employee can assert a Title VII claim only against her employer.  *See* 42 U.SC. § 2000e-2(a) ("It shall be an unlawful employment practice for an *employer* . . . ." (emphasis added)).  The same is true for an employment-based § 1981 claim.  *Florez v. City & Cnty. of Denver*, 30 F. App'x 816, 819 (10th Cir. 2002) ("In employment discrimination cases, § 1981 requires that there be an underlying employment contract between the plaintiff and his or her employer . . . .").

With the time-based and employer issues resolved, the court now can turn to the substance of plaintiff's claims.  Though the court has concluded Midwest Health was not plaintiff's employer, the next five sections nonetheless analyze her Title VII and § 1981 claims

against that entity.  The court provides this added layer of analysis because it provides additional reasons for granting Midwest Health's motion for summary judgment.  To say it another way, even if plaintiff had established a triable issue whether Midwest Health was plaintiff's employer, the court still would grant summary judgment against her Title VII and § 1981 claims against that defendant.  The following sections explain why.

### C.   Whether Defendants Deserve Summary Judgment Against Plaintiff's Race Discrimination Claims

Plaintiff's race discrimination claims arise under Title VII (42 U.S.C. § 2000e-2) and 42 U.S.C. § 1981.  A plaintiff may prove race discrimination through either direct or circumstantial evidence.  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225–26 (10th Cir. 2000). Plaintiff does not offer direct evidence of race discrimination.  The court evaluates circumstantial evidence of Title VII and § 1981 discrimination under the *McDonnell Douglas* framework.  *Id.* ("While *McDonnell Douglas* involved a Title VII claim for failure to hire, the analytical framework it pioneered applies equally to claims brought pursuant to section 1981." (citations and quotation marks omitted)).  The burden-shifting framework of *McDonnell Douglas* requires that "plaintiff bear[] the initial burden of establishing a prima facie case of . . . discrimination[.]" *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006).  If plaintiff satisfies the initial burden, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge[.]"  *Id.*  And if the employer satisfies that burden, then the burden shifts "back to the plaintiff to show that the stated reason is pretextual."  *Id.*

### 1.   Prima Facie Case

Generally, in a discharge case, a prima facie case of employment discrimination requires plaintiff to show "that she (1) belonged to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge."  *Plotke v. White*,

405 F.3d 1092, 1099 (10th Cir. 2005). "For most plaintiffs, establishing a prima facie case is perfunctory, and liability turns on whether the defendant's stated explanation for the adverse employment action is pretextual." *Argo*, 452 F.3d at 1201.

But reverse discrimination cases are different. Because "members of the majority group are not necessarily entitled to a presumption of discrimination afforded to members of a minority group," *Mattioda v. White*, 323 F.3d 1288, 1292 (10th Cir. 2003), the prima facie case for reverse discrimination requires a "stronger showing," *Argo*, 452 F.3d at 1201. Reverse discrimination plaintiffs can make this stronger showing in one of two ways.

The first alternative modifies the initial element of the traditional prima facie case. Instead of "showing that [she] belongs to a protected group"—normally the first component of the prima facie case—the reverse discrimination plaintiff must "establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992). When the plaintiff invokes this alternative, the other three components of the prima facie case remain the same.

Under the second alternative, the plaintiff may establish her entire prima facie case by presenting "indirect evidence sufficient to support a reasonable probability that but for the plaintiff's status" she would not have suffered the challenged employment decision. *Id.* at 590. This alternative replaces the entire prima facie case normally applied in discrimination cases. A reverse discrimination plaintiff cannot "merely . . . allege that [she] was qualified and that someone with different characteristics was the beneficiary of the challenged employment decision." *Id.* "Instead, [such a] plaintiff must allege and produce evidence to support *specific facts* that are sufficient to support a reasonable inference that but for plaintiff's status the

challenged decision would not have occurred." *Id.* (emphasis added). If a reverse discrimination plaintiff satisfies either formulation for the prima facie case, then the remainder of the *McDonnell Douglas* framework applies. *Id.* at 591.

Plaintiff here tries to meet her prima facie burden by arguing that Ms. King-Alvoid, her immediate supervisor and a Black woman, "showed favoritism toward Black, African-American, and African employees who were similarly situated[.]" Doc. 93 at 27. Plaintiff claims that this "favoritism expressed itself in disparate treatment in time off requests, requiring the Plaintiff but not the favored employees to find substitutes for time-off requests; and disparity in matters of discipline, resulting in no discipline for the favored employees when they made mistakes or refused assignments." *Id.* at 27–28. Meanwhile, plaintiff claims she experienced "false allegations . . . for her work performance" and "nitpicking [of] her performance." *Id.* at 28. The court concludes that plaintiff's argument fails to identify "specific facts" sufficient to support a reasonable inference of the "but for" requirement of the prima facie case—the only one of the two alternatives she invokes.

Plaintiff's arguments simply misapprehend and misapply this alternative. As *Argo* explains, this form of the prima facie case requires plaintiff to adduce facts capable of supporting a reasonable inference that but for her "status"—*i.e.*, she isn't a Black, African American, or African person—that the "challenged decision" wouldn't have occurred. Plaintiff's discrimination claim challenges one employment decision by her employer—the termination of her employment. Doc. 77 at 9 (Pretrial Order ¶ 4.a.) But all of plaintiff's arguments rely on alleged disparities in treatment for time off requests, discipline, false allegation, and nitpicking. Her arguments fail to connect the things that *Argo* requires her to connect—that is, her "status"

36

and the employment decision she challenges as reverse discrimination.  452 F.3d at 1201.

Plaintiff's argument lacks a causal link between disparities in treatment and termination.

Plaintiff's proffered reasons for her termination weaken her causal connection.  Plaintiff

stipulated to the stated reason for her termination:  that she neglected patient care duties related

to the health and physical comfort of a resident when she failed to follow a reasonable request

from a family member related to the care of his father and when she conducted herself

unprofessionally in a manner that adversely effected the facility.  Doc. 77 at 3 (Pretrial Order ¶

2.a.12.).  In her Memorandum, she lists other possible reasons for her termination:  taking or

distributing photos or videos of a resident, violating the Code of conduct, discourteous conduct

toward others, unprofessional conduct, prior disciplinary notices, or costing Pioneer Ridge

Nursing $24,000 after an audit.  Doc. 93 at 6–7.  Plaintiff provided the court with a list of

reasons for her termination that have nothing to do with her status as a white person.

In *Argo*, the Circuit held that, even assuming plaintiff's boss (a woman) had an

inappropriately discriminatory attitude toward the plaintiff (as a man), plaintiff's evidence of

discrimination—flirtatious comments, an inappropriate card, and an incident of toe-touching—

wasn't connected to plaintiff's termination.  *Argo*, 452 F.3d at 1201–02.  *Notari* deemed it

insufficient for a plaintiff "merely to allege that [she] was qualified and that someone with

different characteristics was the beneficiary of the challenged employment decision."  *Notari*,

971 F.2d at 590.  Plaintiff here alleges her Black, African American, and African coworkers

were beneficiaries of Ms. King-Alvoid's favoritism.  But, plaintiff is missing a link in the causal

chain, the one requiring her to connect the time off requests, disparate discipline, false

allegations, and nitpicking with the termination of her employment.  *Notari* and *Argo* require

plaintiff to adduce specific facts supporting a reasonable inference that, but for plaintiff's status,

she wouldn't have been terminated.  Plaintiff's evidence requires the court to speculate; she has not provided specific facts making that inference a reasonable one.

In sum, plaintiff's arguments fail for the same reason that *Argo*'s plaintiff failed to survive summary judgment:  she can't connect the adverse employment actions to her status. 452 F.3d at 1202.  Plaintiff thus fails to shoulder the prima facie burden that *Argo* imposes.  And here, as there, this failure precludes her from surviving summary judgment.  But, under the summary judgment standard, plaintiff's prima facie case is close—plaintiff falls just short of facts that support a reasonable inference of discrimination.  One could argue that, despite the heightened bar of the prima face race for reverse discrimination claims, a reasonable factfinder could infer plaintiff's termination was connected to her disparate treatment in other ways. Because it's close, the court analyzes the rest of the *McDonnell Douglas* framework.

## 2.  Legitimate, Nondiscriminatory Reason for the Discharge

Since plaintiff failed her burden at the prima facie stage, the court's analysis of her Title VII and § 1981 claims could end there.  Governing authority recognizes that plaintiff's failure to establish the prima facie burden of her case warrants summary judgment.  *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1150 (10th Cir. 2008) (stopping the analysis after finding plaintiff's Title VII claim failed as a matter of law because plaintiff didn't establish prima facie case).  But additional, independent reasons also warrant summary judgment against plaintiff's reverse discrimination claims under Title VII and § 1981.  The court thus continues its analysis, reaching the second and third steps of the *McDonnell Douglas* framework.

Even if plaintiff established a prima facie case for reverse race discrimination, her arguments continue to struggle at the second step of *McDonnell Douglas.*  On this second step, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for the

38

employment action taken against plaintiff. *Argo*, 452 F.3d at 1201; *Mitchell v. City of Wichita*, 140 F. App'x 767, 782 (10th Cir. 2005). As discussed above, plaintiff stipulates to the "stated reason" given by her employer for her termination:

> that she neglected patient care duties related to the health and physical comfort of a resident when she failed to follow a reasonable request from a family member related to the care of his father and when she conducted herself unprofessionally in a manner that adversely effected the facility.

Doc. 77 at 3 (Pretrial Order ¶ 2.a.12) (quotation marks omitted). This reason is a legitimate, nondiscriminatory reason for plaintiff's termination. *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256–57 (1981) (reciting that "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by [reverse] discriminatory animus" and describing defendant's burden as merely one of production, not of persuasion). Plaintiff's stipulation agrees that defendant Pioneer Ridge Nursing articulated a racially neutral reason for terminating her employment. And, other potential reasons for termination provided by plaintiff also are legitimate, nondiscriminatory reasons. This satisfies the employer's burden at this second stage and thus shifts the burden back to plaintiff for the third analytical stage—can plaintiff show that the employer's reasons are a pretext. *Kendrick*, 220 F.3d at 1230. The next subsection takes up that issue.

### 3. Pretext

Plaintiff's reverse race discrimination claim also fails because she has not adduced evidence sufficient to establish a genuine issue about pretext.

Prextext is the third and final step of the *McDonnell Douglas* framework. *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007). At this stage of the analysis, plaintiff bears the burden to show that the reason given by the employer for the adverse

employment action is pretextual.  *Argo*, 452 F.3d at 1201.  "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).  A plaintiff shows pretext where admissible evidence demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Swackhammer*, 493 F.3d at 1167 (citations and internal quotation marks omitted).

In *Platero v. Baumer*, as an example, our Circuit found a triable issue of pretext based on inconsistency because "every criticism in [defendant's reason for termination was] facially inconsistent with, if not in flat contradiction of, ratings the plaintiff received from her supervisor."  98 F. App'x  819, 821 (10th Cir. 2004).  When evaluating pretext, the court must "'examine the facts as they appear *to the person making the [employment] decision*.'" *Bird v. W. Valley City*, 832 F.3d 1188, 1201 (10th Cir. 2016) (emphasis in original) (quoting *Conroy v. Vilsack*, 707 F.3d 1163, 1174 (10th Cir. 2013)).  "'We do not ask whether the employer's proffered reasons were wise, fair or correct; we ask only whether the employer honestly believed those reasons and acted in good faith upon those beliefs.'"  *Id.* (quoting *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (brackets omitted)).

In *Bird*, plaintiff tried to demonstrate a genuine issue of material fact of pretext by arguing that the reasons her supervisor gave for her termination during his deposition differed from the reasons her supervisor gave at the time of termination.  832 F.3d at 1201.  The Circuit acknowledged that a changing explanation for termination after legal proceedings have begun would present a triable issue of pretext sufficient for a plaintiff to survive summary judgment.

40

*Id.* But the Circuit held that *Bird*'s plaintiff hadn't presented evidence from which a jury could infer pretext because her supervisor

> did not change the *reasons* he gave for terminating Plaintiff. He has steadfastly affirmed from the time of Plaintiff's termination that he fired her because of her insubordination toward [her supervisor] and discourtesy toward her fellow employees. Instead, in his testimony, [the supervisor] merely offered *specific examples* of this insubordination and discourtesy.

*Id.* at 1201–02. Thus, a defendant, without risking pretext, can amplify the reasons given for discharge if those amplifications provide specific examples of related misconduct. *Id.* Put differently, specific examples of the reason specified for plaintiff's termination are evidence of consistency, not inconsistency. *Id.*

Here, plaintiff's pretext argument is meager. She devotes less than a page to the topic. *See* Doc. 93 at 31. Her argument never cites any aspect of the summary judgment record, arguing generally instead that defendants cited "[v]iolations of work rules, prior violations of policies, and incurring a large expense" during an audit as reasons for her termination. *Id.* She also asserts that defendants have cited one "incoherent" reason for the adverse action, *i.e.*, plaintiff violated a work rule that prohibited taking photographs of a resident. *Id.* But when the court closely examines the cited aspects of the record, it finds that plaintiff's arguments contradict the summary judgment record.

The requisite analysis begins with the legitimate, nondiscriminatory reason defendants give for plaintiff's job termination. In the Pretrial Order, the parties stipulated to the reason given for this decision:

> The stated reason for [plaintiff's] termination was that she "neglected patient care duties related to the health and physical comfort of a resident when she failed to follow a reasonable request from a family member related to the care of his father" and when she "conducted herself unprofessionally in a manner that adversely effected the facility."

Doc. 77 at 3 (Pretrial Order ¶ 2.a.12.).  The closest plaintiff comes to identifying any admissible evidence to support her argument of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" is her response to defendants' statement of fact number 32.  *See* Doc. 93 at 6.  There, plaintiff cites four passages of the summary judgment record that purportedly contradict the legitimate, nondiscriminatory reason given by defendants.  *Id.*  But as the next four paragraphs explain, none identify a weakness or incoherence or otherwise contradict the stipulated reason given for plaintiff's termination.

*First*, plaintiff cites page two of Doc. 81-8 (Ex. 7).  In the report, submitted to KDADS, defendant Pioneer Ridge Nursing reported:  "Upon review of the actions of Wendy Painter, LPN the decision was made to terminate employment based on failure to meet a reasonable request of a family member."  *Id.*  This statement doesn't contradict the stipulated reason given for plaintiff's termination.  It agrees that plaintiff's employment was terminated after she "neglected [her] patient care duties . . . when she failed to follow a reasonable request from a family member related to the care of his father[.]"  Doc. 77 at 3 (Pretrial Order ¶ 2.a.12.).  No reasonable jury could find a contradiction or inconsistency between these two statements.

*Second*, plaintiff cites Doc. 81-4 (Ex. 3).  Plaintiff claims that Pioneer Ridge Nursing cited three work rule violations as the reason for plaintiff's termination.  Doc. 93 at 6.  No reasonable juror could accredit plaintiff's characterization of this exhibit.  This record identifies three work rules that plaintiff violated, but it never asserts that these rule violations are the reasons given for plaintiff's termination.  To the contrary, the narrative summary of plaintiff's violation precisely tracks the stated reason for her departure—reporting that plaintiff "neglected patient care duties related to the health and physical comfort of a resident when she failed to

follow a reasonable request from a family member . . . [plaintiff] conducted herself unprofessionally . . . ."  Doc. 81-4.

*Third*, plaintiff asserts that defendants cited "discourteous conduct toward any patient, visitor, doctor, or employee, unprofessional conduct" as the reason for plaintiff's termination and it's inconsistent with Pioneer Ridge Nursing's given reason.  She also identifies the deposition of Ms. Bell as part of the discovery record supporting this factual assertion.  Doc. 93 at 6 (citing Bell Dep. 90:4–10).  While the summary judgment record contains some passage from Ms. Bell's deposition (*see* Doc. 94-11), plaintiff never supplied the court with page 90 of Ms. Bell's deposition.  The court thus could decline to consider this argument for the simple reason that plaintiff has failed to carry her burden to provide admissible evidence supporting her characterization of Ms. Bell's testimony.  But even if plaintiff had provided the cited pages from the deposition and even if her paraphrase of the actual testimony is 100% accurate, no reasonable jury could find that it contradicts the stipulated reason given by defendants.  Purported testimony that plaintiff treated a patient or visitor "discourteous[ly]" does not contradict defendants' assertion that plaintiff behaved "unprofessionally."

*Last*, plaintiff cites a letter sent to the EEOC by Midwest Health's General Counsel.  Doc. 93 at 6 (citing Doc. 93-3 (Ex. 26) at 2–3).  Plaintiff characterizes this letter as citing disciplinary notices "from at least eleven months before termination and extending back to 2007" as reasons given for plaintiff's termination and thus, in plaintiff's view, it provides an inconsistency with the stipulated reasons actually given for terminating plaintiff's employment.  *Id.*  But no reasonable jury could interpret the letter to say what plaintiff attributes to it.  Instead, the General Counsel's letter recites, "Ms. Painter was terminated on February 22, 2018 due to a final written warning involving a family complaint regarding resident neglect."  Doc. 93-3 at 2.  The letter

does discuss earlier disciplinary action against plaintiff.  *See id.* (reporting, "Ms. Painter has previously been disciplined for similar actions" and referring to March 2017 discipline).  But the General Counsel's letter never asserts or even implies that plaintiff's March 2017 discipline was the reason for her termination, and no reasonable jury could find or infer that it did.

In sum, even assuming plaintiff could establish her prima facie case, defendants still deserve summary judgment because plaintiff has failed to provide a basis for a reasonable jury to find pretext.  The court thus grants summary judgment against plaintiff's discrimination claims in Count I (Title VII) and Count III (§ 1981).

### D.    Whether Defendants Deserve Summary Judgment Against Plaintiff's Retaliation Claims

Next, the court considers plaintiff's retaliation claims.  Plaintiff asserts that defendants retaliated against her for making complaints of race discrimination, thus violating Title VII and § 1981.  Doc. 77 at 9 (Pretrial Order ¶ 4.a.)  Defendants have moved for summary judgment against both claims.

Title VII forbids retaliation.  42 U.S.C. § 2000e-3(a).  Specifically, this act makes it unlawful to discriminate against an employee "because [she] has opposed any practice" made unlawful under Title VII.  *Id.*  When a plaintiff relies on circumstantial evidence to prove retaliation, as plaintiff does here, courts apply the *McDonnell Douglas* burden shifting framework.  *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015).

Retaliation claims under Title VII and § 1981 have identical requirements for establishing retaliation, so "the principles set forth in Title VII retaliation cases apply with equal force in § 1981 retaliation cases."  *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011).  In the first step of the *McDonnell Douglas* framework, "plaintiff bears the initial burden of establishing a *prima facie* case of retaliation by demonstrating that (1) he or she engaged in a

44

protected activity, (2) he or she suffered a material adverse action, and (3) there was a causal connection between the protected activity and the adverse action." *Thomas*, 803 F.3d at 514. If plaintiff can establish a prima facie case of retaliation, the burden shifts to defendant to provide a "'legitimate, non-retaliatory reason for the adverse employment action.'" *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016) (quoting *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015)). If defendant satisfies its burden, after this second stage "'plaintiff must show that the defendant's proffered rationale is pretextual.'" *Id.* (quoting *id.*).

### 1. Has Plaintiff Established a Triable Issue of Fact about Whether Plaintiff Engaged in a Protected Activity?

The first issue raised by defendants' motion is whether plaintiff can shoulder the first burden of her prima facie case, establishing that she engaged in protected activity. *See Thomas*, 803 F.3d at 514. Plaintiff claims she can satisfy this burden, arguing that she "presented specific complaints about disparate discipline, time-off requests[,] and work assignments directly to [Administrator] Bell." Doc. 93 at 34.

"Protected activities fall into two distinct categories: participation or opposition." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1151 (10th Cir. 2008) (quoting *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)). Participation involves "'participat[ing] in any manner in an investigation, proceeding, or hearing under' Title VII." *Id.* (internal emphasis omitted) (quoting 42 U.S.C. § 2000e-3(a)). Opposition prohibits an employer from retaliating "against an employee 'because [she] has opposed any practice made an unlawful employment practice' by Title VII." *Id.* (quoting 42 U.S.C. § 2000e-3(a)). Here, plaintiff relies on the opposition prong. Specifically, she claims that she was assigned to the Rapid Recovery Unit and Pioneer Ridge Nursing terminated her employment after complaining to Ms. Bell about it. Doc. 93 at 34.

"Protected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). "To oppose discrimination, an employee need not use any 'magic words' but [the employee] 'must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by Title VII or § 1981.'" *White v. CertainTeed Corp.*, No. 17-2262-DDC-KGG, 2019 WL 2085671, at *19 (D. Kan. May 13, 2019) (brackets omitted) (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)). "General complaints about company management and one's own negative performance evaluation will not suffice." *Hinds*, 523 F.3d at 1203. "[A] vague reference to discrimination and harassment without any indication that this misconduct was motivated by race . . . does not constitute protected activity and will not support a retaliation claim." *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004).

In *White*, for example, plaintiff argued that a communication to his supervisor qualified as protected activity.[18] *White*, 2019 WL 2085671, at *20. Plaintiff "used the word 'harassment' in passing but he never identified any race-based motivation on the part of [defendant's Plant Superintendent] or any other [defendant] manager." *Id.* The court held that plaintiff's complaint "was a general complaint insufficient to place [defendant's Supervisor] on notice that [plaintiff] sought to oppose race discrimination. Nor could [plaintiff's Supervisor] have inferred that [plaintiff's] complaint about how he was treated compared to other utility cullets was about race discrimination when the other three utility cullets . . . were all African-American [like plaintiff]." *Id.* Plaintiff testified that he "never complained of discrimination to any [defendant] manager . . . ." *Id.*

---

[18]     Plaintiff asserts that *White* undermines defendants' arguments because the plaintiff there "never presented his complaints to a supervisor." Doc. 93 at 34. This account reads *White* inaccurately. As the court explained, plaintiff communicated with Mr. Monroe, who was the Shift A supervisor. *White*, 2019 WL 2085671, at *2–3.

Here, plaintiff made two complaints to the facility's administrator, Ms. Bell. Doc. 80-3 at 11 (Pl.'s Dep. 58:3–5). Plaintiff made her first complaint at the end of 2016 or beginning of 2017. *Id.* (Pl.'s Dep. 58:6–11). She told Ms. Bell that she "was feeling kind of frustrated because [she] was being . . . questioned about [her] job performance from [Ms. King-Alvoid]." *Id.* (Pl.'s Dep. 58:12–25). And, plaintiff complained that other nurses made errors and other nurses were insubordinate. *Id.*

Plaintiff made her second complaint in October 2017. *Id.* at 12 (Pl.'s Dep. 60:15–18). In this second complaint, plaintiff told Ms. Bell she felt "picked on." *Id.* (Pl.'s Dep. 60:19–61:7). Plaintiff said her job performance was questioned "on a daily basis," she couldn't get time off when requested, she had to find a replacement when she was sick, and she was assigned to the Rapid Recovery Unit when other nurses could refuse assignment. *Id.* In this second complaint, plaintiff used the word "discriminating." Doc. 93-1 at 10–11 (Pl.'s Dep. 93:24–94:3) ("I believe I actually did use the word discriminating.").

While it is a close call, the court holds that a reasonable juror might find that plaintiff engaged in protected activity when she made her second complaint. Unlike *White*, plaintiff used the word "discriminating" when she talked to Ms. Bell. *Id.* A reasonable juror reasonably could find or infer that plaintiff "engaged in a practice made unlawful by Title VII or § 1981" by complaining to a superior employee about the inconsistent treatment she and her coworkers received. *White*, 2019 WL 2085671, at *19 (brackets omitted) (quoting *Hinds*, 523 F.3d at 1203). As plaintiff explains, the law does not require magic words to convey to her employer the concern that the employer had engaged in a practice made unlawful by Title VII or § 1981. *Hinds*, 523 F.3d at 1203. Plaintiff is white, and her direct manager and some of her coworkers were Black, African American, or African. A reasonable factfinder could determine that

47

complaining about "inconsistent" treatment in this setting, when viewed in the light most favorable to plaintiff, expressed more than general dissatisfaction. Instead, such a juror could find that plaintiff put Ms. Bell (and her employer) on notice that the disparity in treatment was connected to discrimination and race. Plaintiff has identified a genuine, triable issue about this requirement, so defendants can't secure summary judgment on this basis.[19]

> **2. Has Plaintiff Shouldered Her Burden To Establish the Third Requirement of Her Prima Facie Case—A Causal Connection Between Her Protected Activity and the Adverse Action?**

The third requirement of plaintiff's prima facie case requires her to adduce admissible evidence of "a causal connection between the protected activity and the adverse action." *Thomas*, 803 F.3d at 514. A plaintiff satisfies this burden by coming forward with admissible evidence that, but for the protected activity, defendant never would have taken the materially adverse action which supports plaintiff's claims. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Timing matters to this analysis. "A retaliatory motive can be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). What counts as "closely follows?" Our Circuit has held that a three month interval between protected activity and adverse action, "standing alone," is too distant to "establish causation." *Id.* (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (affirming grant of summary judgment against retaliation claim because three month gap was too attenuated to support a triable issue over causal connection to protected activity)).

---

[19] Plaintiff's first complaint—the one she made to Ms. Bell near the end of 2016 or during early 2017—is different. Even under plaintiff's version of the facts, she merely reported frustration over questions about her performance by Ms. King-Alvoid and noted that other nurses erred. This report is the kind of general complaints to management that neither Title VII nor § 1981 protects from retaliation. *See Hinds*, 523 F.3d at 1203.

In the current case, plaintiff claims that two actions by her employer qualify as adverse actions capable of supporting her retaliation claim. First, she claims that defendants retaliated against her when they assigned her to the Rapid Recovery Unit. Second, she claims that defendants terminated her employment as a final act of retaliation. Doc. 93 at 35–36. The timing of these two events differs, so the court examines them separately in the next two subsections.

### a. Assignment to Rapid Recovery Unit

The court has determined that only one of plaintiff's two complaints could qualify as protected activity. *See supra* p. 46 (reasonable jury could find complaint in October 2017 amounted to protected activity); *supra* p. 47, n.20 (holding that complaint in late 2016 or early 2017 cannot qualify as protected activity). Given the importance of timing to the retaliation analysis, the obvious questions ask: (1) when was plaintiff assigned to work in the Rapid Recovery Unit? and (2) how closely do the dates of those assignments follow the only protected activity in which plaintiff engaged?

While plaintiff devoted four pages of her Opposition to the retaliation discussion, she never identifies when defendant assigned her to the Rapid Recovery Unit. *See* Doc. 92 at 32–36. In short, she never comes forward with any basis for a reasonable juror to find whether this purported "adverse actions closely follow[ed] [her] protected activity." *Anderson*, 181 F.3d at 1179.

The closest she comes is a short, generalized discussion at the end of her retaliation analysis. There, she asserts that her assignments to the Rapid Recovery Unit "continued after the second complaint." Doc. 93 at 36. The court understands plaintiff's reference to her second complaint to refer to her October 2017 complaint since it is the later of plaintiff's two

complaints.  The court also reads plaintiff's argument to claim that her employer assigned her to this unit both before and after October 2017.

Even with these generous assumptions, a retaliation claim predicated on these assignments can't survive summary judgment.  For one thing, plaintiff hasn't adduced any admissible evidence about the date of these assignments to the units.  Defendants' Memorandum never identified the date of plaintiff's assignments to this unit.  Nor did plaintiff's Opposition, even though she provided 69 paragraphs of additional statements of fact.  Indeed, plaintiff's facts only refer to the Rapid Recovery Unit twice.  Neither reference provides any date for the assignments.  *See* Doc. 93 at 4, 20 (Pl.'s Mem. In Opp'n To Defs.' Mot. For Summ. J. ¶¶ 19, 129) (responding to paragraph of same number in Doc. 79 and plaintiff's statement of additional fact).  For another thing, even if plaintiff's theory was that the Rapid Recovery Assignment predated her next complaint or worsened after her first complaint, she hasn't adduced evidence of either.  It is plaintiff's burden to provide evidence to support these theories—the court cannot engage in factfinding.

At summary judgment, plaintiff holds the burden to show that a reasonable jury could find "a causal connection between the protected activity and the adverse action" she claims.  *Thomas*, 803 F.3d at 514.  Plaintiff hasn't met her burden to show that her assignment to the Rapid Recovery Unit bears such a causal connection to any protected activity.  This failure warrants summary judgment against that prong of her retaliation argument.

### b.  Termination of Employment

Plaintiff's other claim of retaliation follows a more traditional path.  It contends that defendants terminated her employment because she complained about discrimination.  *See* Doc. 93 at 32–36.  But as plaintiff concedes, the undisputed timeline precludes this theory.  *See id.* at

36 ("Plaintiff agrees that the time gap between the last complaint and the Plaintiff's termination was too long to provide causal proof without an additional showing of causation").

Putting a sharper point on this issue, plaintiff contends that defendants terminated her employment on February 22, 2018, to retaliate for her two complaints about discrimination. But the only protected activity—her October 2017 complaint—occurred at least three-plus months before the termination. As already cited, our Circuit has held that acts of alleged retaliation three months after protected activity, "standing alone," can't establish causation. *Richmond*, 120 F.3d 205, 209 (10th Cir. 1997) (affirming grant of summary judgment against retaliation claim on this basis).

Plaintiff's only response to this shortcoming in her claim is her argument that her termination isn't the only material adverse action she sustained. She argues that she also endured "much less desirable job assignment[s]" to the Rapid Recovery Unit and those assignments "were part of a chain of events that led to the termination." *See* Doc. 93 at 36. But here plaintiff encounters a familiar problem: she has failed to come forward with any admissible evidence showing when she was assigned to the "less desirable" Rapid Recovery Unit. The court concludes that plaintiff cannot rely on assertions unsupported in the summary judgment record to avoid summary judgment on this second aspect of her retaliation claim.

In sum, neither episode of retaliation claimed by plaintiff can withstand the governing legal analysis. Plaintiff has failed to provide a basis for a reasonable jury to find (or infer) "a causal connection between the protected activity and the adverse action" of which she complains. *Thomas*, 803 F.3d at 514. The court thus grants summary judgment against plaintiff's retaliation claims in Count II (Title VII) and Count IV (§ 1981).

### E.  The Court Will Exercise Supplemental Jurisdiction Over Plaintiff's State Law Claims

In addition to her claims under federal law, plaintiff asserts two state law claims: Tortious Interference with Prospective Contractual Relationship or Expectancy (Count V) and Blacklisting (Count VI).  Doc. 77 at 11 (Pretrial Order ¶ 5).  With summary judgment granted against all of plaintiff's federal law claims, the court now must determine whether it has subject matter jurisdiction (in the form of supplemental jurisdiction) over plaintiff's state law claims. Neither party has raised the issue, so, the court raises it on its own since it involves subject matter jurisdiction.

Our Circuit has expressed the preference that, when a district court dismisses all federal claims, it typically should decline to exercise supplemental jurisdiction over state law claims. *See Smith v. City of Enid ex rel. City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)).  The supplemental jurisdiction statute, 28 U.S.C. § 1367, provides, in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

Several factors guide this supplemental jurisdiction inquiry.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (instructing federal district courts—when considering whether to exercise supplemental jurisdiction—to weigh "the values of judicial economy, convenience, fairness, and comity"); *see also Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013) ("[T]he [district] court should consider retaining state law claims when, given the

nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction." (citation and internal quotation marks omitted)).  Still, this decision is committed to the district court's sound discretion.  *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004).

In this Order, the court has concluded that defendants are entitled to judgment as a matter of law against all of plaintiff's federal claims.  In many cases, this finding would end the court's inquiry because it would make it more appropriate for a state court to decide plaintiff's remaining claims.  This inclination is informed by the requirement that the court consider notions of fairness and comity, among others.  *See Cohill*, 484 U.S. at 350; *see also Wittner*, 720 F.3d at 781.

Yet, the court can't decline supplemental jurisdiction in this case without first addressing a unique holding by the Kansas Supreme Court.  *See Stanfield v. Osborne Indus., Inc.,* 949 P.2d 602 (Kan. 1997); *see also Rhoten v. Dickinson*, 223 P.3d 786 (Kan. 2010).  In those cases, the state's supreme court twice has ruled that a plaintiff may not pursue refiled state law claims in state court after a federal district court—having dismissed all federal claims—has declined to exercise supplemental jurisdiction over those state law claims.  *Stanfield*, 949 P.2d at 612–13; *Rhoten*, 223 P.3d at 800.  In both cases, the federal district court had dismissed the state law claims without prejudice, but the Kansas courts held that claim preclusion barred plaintiff from pursuing the refiled state law claims in state court.  *Id.*  Against this unusual backdrop, the court elects to exercise supplemental jurisdiction over plaintiff's state law claims for several reasons— and not just because of the current Kansas rule.  The next three paragraphs explain why.

*First*, the court must consider whether fairness favors exercising supplemental jurisdiction or declining it.  *See Cohill*, 484 U.S. at 350; *see also Wittner*, 720 F.3d at 781.  Here,

the court must choose between two alternatives.  Under the first one, the court could decline to exercise its supplemental jurisdiction, dismiss the state law claims without prejudice, and thus provide plaintiff with the procedural opportunity to reassert her state law claims in state court.  But the holdings in *Stanfield and Rhoten* make this opportunity more of an option in theory than it is practice.  For upon refiling in Kansas state court, plaintiff likely would encounter a motion to dismiss based on a procedural doctrine unconnected to the merits of her claims.  And under the current state of law, it's unlikely plaintiff could survive such a motion.[20]  In this unusual context, it seems unfair to decline supplemental jurisdiction and preclude plaintiff from getting a determination on the merits.  Fairness favors exercising jurisdiction.

*Second*, given the parties' extensive debate about these state law claims, both judicial economy and convenience benefit from the court exercising supplemental jurisdiction.  *See Cohill*, 484 U.S. at 350; *see also Wittner*, 720 F.3d at 781.  The court already has everything it needs to rule plaintiff's state law claims on their legal merits.  The parties already have devoted substantial effort to argue the claims and the controlling state law is settled.  Thus, it would waste everyone's time and resources to send the parties packing to a state court where they would have to perform the same work again—for a judge new to the scene.  Judicial economy thus favors invoking supplemental jurisdiction.

*Third*, and building on the court's analysis of the first two factors, exercising supplemental jurisdiction in this case won't offend comity.  For one thing, the rule in *Stanfield* and *Rhoten* seems to encourage federal courts to retain and decide claims like these.  The views implied by Kansas state courts don't displace the prevailing standard of our Circuit, of course.

---

[20]     The court is mindful that the Kansas Supreme court recently heard oral argument in a case asking the Kansas Court to revisit the rule in *Stanfield* and *Rhoten*.  The court's comment do not intend to make any prediction about the outcome of that pending appeal.

*See Wittner*, 720 F.3d at 781.  But they do alleviate concerns that exercising supplemental

jurisdiction will harm the relationship between the federal courts and Kansas state courts.  The

court concludes this consideration is a neutral one.

Having considered the factors articulated by the Supreme Court in *Cohill*, 484 U.S. at

350, and by the Tenth Circuit in *Wittner*, 720 F.3d at 78, the court concludes that exercising its

supplemental jurisdiction under 28 U.S.C. § 1367, is the appropriate course.  The court thus turns

to plaintiff's Kansas state law claims.

### F.  Whether Defendants Deserve Summary Judgment Against Plaintiff's Tortious Interference with Prospective Contractual Relationship or Expectancy Claim

First, the court must determine whether plaintiff's tort claim is timely.  Plaintiff's claim

for tortious interference with a prospective contractual relationship or expectancy is governed by

Kansas common law.[21]  Defendants argue that, under Kan. Stat. Ann. § 60-513(a)(4), plaintiff's

claim for tortious interference is subject to a two-year statute of limitations.  Doc. 79 at 27.

Plaintiff asks the court to apply the relation back doctrine, which the court has concluded is

appropriate.  That conclusion applies to the analysis for the state law claims as well.  *Lemmons v.*

*Bd. of Cnty. Comm'rs of Cnty. of Brown*, No. 00-2297-CM, 2002 WL 370227, at *2 (D. Kan.

Feb. 21, 2002) ("When a complaint is filed in federal court, the matter of relation back of

---

[21]     In the Pretrial Order, the parties agree that Kansas law applies to both state law claims.  Doc. 77 at 2.  This agreement conforms to the choice of law rules the court must apply.  *See BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1104 (10th Cir. 1999) (citations omitted) (holding that a federal court exercising supplemental jurisdiction over state law claims in a federal question lawsuit applies the substantive law, including choice of law rules, of the forum state).

Plaintiff's blacklisting claim is statutory, governed by Kan. Stat. Ann. §§ 44-117 and 44-119.  Plaintiff's tortious interference claim is a common law tort.  In tort cases, Kansas courts apply the law of the place of the wrong.  *Ling v. Jan's Liquors*, 703 P.2d 731 (Kan. 1985).  The place of the wrong is that place where the last event necessary to impose liability took place.  *Id.*  In this case, the last event necessary to impose liability against defendants for tortious interference was in Kansas, so Kansas law governs.

amendments to pleadings is governed by the Federal Rules of Civil Procedure") (collecting cases).

Plaintiff's employment was terminated on February 22, 2018. Doc. 77 at 3 (Pretrial Order ¶ 2.a.11.). Consequently, plaintiff had until February 22, 2020, at the earliest, to file her claim for tortious interference. Plaintiff filed her Complaint on June 22, 2019. Doc. 1. Because her Third Amended Complaint naming Pioneer Ridge Nursing as a defendant relates back to the original complaint, plaintiff's tortious interference claim is timely.

Second, under Kansas law, a viable claim for tortious interference requires

> (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

*Turner v. Halliburton Co.*, 722 P.2d 1106, 1115 (Kan. 1986)).

"Tortious interference with a contract is predicated on malicious conduct by the defendant." *Dickens v. Snodgrass, Dunlap & Co.*, 872 P.2d 252, 257 (Kan. 1994) (citing *Turner v. Halliburton Co.*, 722 P.2d 1106, 1115 (Kan. 1986)). "The Kansas Pattern Instructions define malice as 'a state of mind characterized by an intent to do a harmful act without a reasonable justification or excuse.'" *Radiologix, Inc. v. Radiology & Nuclear Med., LLC*, No. 15-4927-DCC-KGS, 2017 WL 5007143, at *46 (D. Kan. Nov. 2, 2017) (quoting PIK Civ. 4th 103.05). "The Kansas Supreme Court has described malice as 'actual evil-mindedness or specific intent to injure.'" *Id.* (quoting *Turner*, 722 P.2d at 1113). Typically, malice is a question for the jury. *Id.* But at the summary judgment stage, "a court can decide that no triable issue of malice exists if the undisputed material facts support such a finding." *Id.* (citations omitted).

Defendants make four summary judgment arguments.  *First*, defendants argue that no connection exists between Pioneer Ridge Nursing and the KDADS investigation:  As they put it, "Defendants had nothing to do with KDADS' independent investigation and determination of Abuse and Neglect, or with the address that KDADS used for [plaintiff] when it sent notice of its Abuse and Neglect finding."  Doc. 79 at 24.  *Second*, defendants argue that plaintiff hasn't presented a triable issue whether defendants committed tortious interference because KDADS made an "independent" decision to place plaintiff on "Employment Prohibition" status.  *Id.* at 24–25.  *Third*, defendants argue, plaintiff has not demonstrated that she has admissible evidence sufficient to prove the elements of her tortious interference claim.  *Id.* at 25–26.  *Last*, defendants argue that tortious interference claims require malice and plaintiff has adduced no evidence of malice.  *Id.*

Plaintiff disagrees.  *First*, she argues that the connection between Pioneer Ridge Nursing and the KDADS investigation is a fact issue that the court can't decide on summary judgment. The parties debate, at length, who is responsible for plaintiff failing to receive the notice from KDADS.  Doc. 93 at 36–37.  Plaintiff argues it was Pioneer Ridge Nursing, who was responsible for providing the correct address to KDADS, and failed to do so.  *Id.* at 37.  *Second*, plaintiff disputes defendants' assertion that the summary judgment facts establish that KDADS performed an "independent" investigation.  *Id.* at 38.  *Third*, plaintiff contends she has collected admissible evidence sufficient to support her burden for each element of her tortious interference claim. *Last*, plaintiff argues, a jury properly may find or infer malice from circumstantial evidence she has gathered.  *Id.*at 39.

Ultimately, the court concludes that defendants deserve summary judgment against her tortious interference claim because the summary judgment record presents no triable issue

whether Pioneer Ridge Nursing acted with the requisite malice. Plaintiff's evidence of malice is

circumstantial. Doc. 93 at 39. She describes that evidence of malice this way:

> King-Alvoid [plaintiff's supervisor] put the Plaintiff in the worst possible light
> regarding the incident with the resident's son. She completed and submitted the
> report of alleged abuse forms to KDADS. King-Alvoid submitted the forms to the
> KDADS with an outdated and inaccurate address for the Plaintiff. King-Alvoid
> had treated [plaintiff] with racial disparity compared to similarly situated
> employees under the direction of King-Alvoid. Finally, King-Alvoid used Bell as
> her cat's paw to poison the well of goodwill [plaintiff] had built up with Bell.

Doc. 93 at 39 (footnote omitted). The court concludes that none of these arguments can support

a reasonable jury finding or inference of malice. Below, the court addresses all of plaintiff's

arguments and explains why they fail to carry plaintiff's burden.

Plaintiff first argues that Ms. King-Alvoid, her supervisor, placed her "in the worst

possible light regarding the incident with the resident's son." *Id.* This incident occurred on

February 16, 2018, just a few days before her employment terminated. But the record will not

support plaintiff's rhetoric. The undisputed facts establish the words Ms. King-Alvoid used to

report the incident involving plaintiff and the son of a resident she cared for at Pioneer Ridge.

She wrote:

> [The resident's son] stated when Wendy Painter, LPN came to the room that he had
> requested further assessment of his father related to the changes he had noticed, and
> that Wendy did not complete further assessment per his request. . . .
>
> The Charge Nurse Wendy Painter L.P.N. acknowledged to [the patient's] son that
> she was aware that he was in pain earlier in the day and she had administered [pain]
> medication. [The resident's son] requested that Wendy Painter L.P.N. assess his
> father . . . again due to the changes that he had noticed in his father's condition. Per
> [the resident's son] Wendy Painter L.P.N. refused to assess [the resident] any
> further.
>
> [The resident's son] requested that another nurse assess his father, the Unit Manager
> Debby Garrett assessed his father immediately . . . .

Doc. 81-8 at 1. Ms. King-Alvoid's characterization of the incident is, by comparison to plaintiff's own description, a tame version of the events. In her testimony, plaintiff described the incident this way:

> He started asking me questions in regards about his dad's medications, if he had his medications that morning, the night before, and I tried to tell him that I did assess him for pain about an hour before he arrived. He started asking me why haven't I done an assessment on his dad and again, I tried to tell him I did a pain assessment but I haven't further assessed him. And then he started making accusations toward me, saying that I was a poor nurse. I was incompetent, and then started asking me why haven't I done this, done that, and I tried to tell him again, you know, I was there to assess his dad and please don't talk to me like that because then I started feeling threatening. And I told him please don't threaten me. And then he leaned into me and said do you feel threatened now? After he stated that he's a doctor and he was going to get my license. I put up my hands, I walked out of the room and told him that I would go get another nurse to come and assist him and his dad. . . . [W]hen I left the room, I went to find Debby [Garrett] or Leena [King-Alvoid] and about the time I was heading towards the nurse's station, Debby come around the corner on to red hall and I pointed at Debby [Garrett], and because the son actually followed me out of the room and was screaming and hollering how he wanted my license, my name, how incompetent I was, how I'm going to kill his dad.

Doc. 93-1 at 3–4 (Pl.'s Dep. 70:13–71:23).

Next, Ms. King-Alvoid informed KDADS of the steps Pioneer Ridge Nursing took to investigate and remedy the incident:

> Per facility policy regarding allegations of Abuse, Neglect or Exploitation, Wendy Painter L.P.N. was suspended and removed from duties, investigation initiated. Wendy was interviewed by Leena Alvoid, DON. Wendy stated that the resident complained of pain earlier in the shift, at which time she administered his PRN pain medication. Wendy acknowledged that she did not follow through or complete [the resident's son's] request for further assessment of his father . . . .

> Through the investigation of this incident it has been confirmed that there had been a change in [the resident's] condition. The Charge Nurse assigned to care for [the patient] (Wendy Painter L.P.N.) did address [the resident's] complaint of pain earlier in the shift, however did not further assess [the resident] at the request of the son . . . when other symptoms were noticed. It was confirmed that the new symptoms the son had noticed were immediately assessed and addressed by Debby Garret L.P.N. and immediate action was taken to ensure this change of condition was addressed.

Doc. 81-8 at 2.  Then, Ms. King-Alvoid wrote the most critical part, for current purposes, of the report about the incident:  The outcome "of this investigation has been that there was no neglect, and that the changes in condition were assessed and addressed timely."  Doc. 81-8 at 2.  Ms. King-Alvoid closed with, "review of the actions of Wendy Painter, LPN, the decision was made to terminate employment based on failure to meet a reasonable request of a family member."  *Id.*

No reasonable jury could find that Ms. King-Alvoid acted with malice when she wrote and submitted this report to KDADS.  She reported to KDADS that Pioneer Ridge Nursing's investigation had found no neglect on plaintiff's part.  The most damaging information in this report is the assertion that plaintiff refused to assess the patient.  But this is not an accusation that Ms. King-Alvoid made.  Instead, it is undisputed, Ms. King-Alvoid reported that as an accusation that the resident's son made.  Also, Ms. King-Alvoid's report omitted undisputed information that easily could have damaged plaintiff.  For instance, Pioneer Ridge's submission to KDADS did not report the undisputed fact that, on the date of the incident, "plaintiff was involved in an argument in which both [plaintiff] Painter and a resident's son raised their voices."  Yet plaintiff stipulates that she raised her voice during the incident.  *See* Doc. 77 at 3 (Pretrial Order ¶ 2.a.5.).  The court thus concludes that plaintiff's first argument in support of malice simply isn't supported by the summary judgment record.  She cannot survive summary judgment on that basis.

Plaintiff next claims she had adduced sufficient evidence of malice because Ms. King-Alvoid submitted the report to KDADS and provided KDADS with an incorrect address for plaintiff.  Submitting the report cannot service as evidence of malice because the undisputed facts establish that Pioneer Ridge Nursing believed it was legally required to report any allegation of abuse or neglect.  Doc. 80-6 at 10 (King-Alvoid Dep. 200:13–25); Doc. 80-7 at 4

60

(Vogel Dep. 108:6–14). This conclusion leaves plaintiff's argument that Ms. King-Alvoid provided KDADS with an incorrect address for plaintiff. Apparently, plaintiff theorizes that Ms. King-Alvoid provided the wrong address hoping that KDADS would make a finding of abuse or neglect but plaintiff never would know about it or have the chance to contest KDADS's finding. This theory overlooks an undisputed aspect of Pioneer Ridge Nursing's report to KDADS. Pioneer Ridge Nursing found "that there was no neglect, and that changes in [the resident's] condition were assessed and addressed timely." Doc. 81-8 at 2. The court concludes that no reasonable jury could find or infer that defendants acted with malice by submitting a report concluding that plaintiff had not abused or neglected a resident but nonetheless acted maliciously because the report provided an erroneous address for plaintiff.

Plaintiff next argues that she can sustain her burden to prove malice because Ms. King-Alvoid treated plaintiff "with racial disparity." Doc. 93 at 39. The problem with this theory is that it uses one unsound claim to support another claim. Earlier in this Order, the court has held that plaintiff's reverse discrimination claim cannot survive for trial. *See supra* pp. 34–43. And the claim cannot survive for trial for the most basic of reasons: plaintiff cannot make even her prima facie case of discrimination. The court concludes that plaintiff cannot properly use one discredited claim to establish an element of another claim. *See Myers v. Knight Protective Serv., Inc.*, 774 F.3d 1246, 1249 (10th Cir. 2014) (finding plaintiff did not offer evidence to support a triable prima facie case of race discrimination and this failure disposed of plaintiff's tortious interference claim).

Plaintiff also makes a "cat's paw" argument, *i.e.*, that Ms. "King-Alvoid used [Ms.] Bell as her cat's paw to poison the well of goodwill" that plaintiff had developed with Ms. Bell. As plaintiff correctly points out, the federal courts have applied this theory, where supported by

61

evidence, to "hold [the] employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011). As Justice Scalia's opinion explains, this colorful terminology comes from Aesop's fable where: "[A] monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." 562 U.S. at 415, n.2 (citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990 (Posner, J.))). But there's a problem with plaintiff's effort to invoke the cat's paw theory here. She has no evidence of a conniving monkey, any chestnuts, or a gullible cat—much less one with burned paws. At summary judgment, colorful rhetoric is no substitute for admissible evidence. The court finds that she has adduced no evidence capable of supporting the factual predicate of her cat's paw theory. That is her summary judgment burden and her failure to support her theory with evidence makes summary judgment appropriate.

None of plaintiff's purported evidence of malice, even when added together, could support a reasonable finding or inference of malice by defendants. "Genuine factual issues must be supported by more than a mere scintilla of evidence." *Black v. Baker Oil Tools, Inc.*, 107 F.3d 1457, 1460 (10th Cir, 1997) (cleaned up). On this required element of plaintiff's tortious interference claims, plaintiff doesn't even have that much. The court thus grants summary judgment against the tortious interference claim in Count V.

### G.  Whether Defendants Deserve Summary Judgment Against Plaintiff's Blacklisting Claim

Plaintiff's last claim asserts a violation of Kansas's blacklisting statute, Kan. Stat. Ann. § 44-117. The parties agree that this statute (along with § 44-119) govern this claim. *See* Doc. 77 at 2 (Pretrial Order ¶ 1.d.). But the disagreements follow quickly, the first one contesting whether a one-year statute of limitations (defendants' position) of a three year statute of

limitations (plaintiff's view) governs this blacklisting claim.  The court concludes that it need not decide this issue, or even take the intermediate step suggested by plaintiff—certifying the limitations questions to the Kansas Supreme Court.  *See* Doc. 100 (Pl.'s Mot. To Certify Questions of Law to Kan. Supreme Ct.).  The court doesn't need to reach the limitations question because it can decide defendants' summary judgment motion on another basis.

Our Circuit has held that "a criminal blacklisting conviction is required for civil recovery under [Kan. Stat. Ann. §] 44-119."  *Anderson v. United Tel. Co. of Kan.*, 933 F.2d 1500, 1502–03 (10th Cir. 1991).  Our court has applied this rule several times.  *See Hawkins v. MCI*, No. 04-1328-JTM, 2005 WL 1130267, at *7 (D. Kan. May 13, 2005) ("The statute was intended to prevent blacklisting and requires a criminal blacklisting conviction of an employer in order to bring a civil blacklisting claim." (citing *Anderson*, 933 F.2d at 1502–03)); *Harris*, 1994 WL 240759, at *10 (applying *Anderson*, 933 F.2d at 1502–03); *Nelson v. Allstate Ins. Co.*, No. 92-2309-JWL, 1993 WL 105120, at *5 (D. Kan. Mar. 8, 1993) (applying *Anderson*, 933 F.2d at 1502–03); *Jonker v. Melvin Simon & Assoc., Inc.*, No. 86-1654, 1989 WL 31402, at *12 (D. Kan. Mar. 1, 1989) ("This court agrees the plain wording of [Kan. Stat. Ann. §] 44-119 allows the award of a civil remedy against an employer 'found guilty' of violating the Act. . . . [P]laintiff has not alleged nor shown any conviction . . . .").  Plaintiff makes many arguments opposing summary judgment, but she never claims she has evidence of the requisite criminal conviction.

Plaintiff instead argues the court should overrule *Anderson* or find that "a statutory development after the [*Anderson*] opinion was issued demands a different result."  Doc. 93 at 40. Plaintiff provides her own interpretation of the statute and cites a 2015 opinion from the District Court of Harvey County, Kansas.  Doc. 93 at 41; Doc. 94-7.  But while *Anderson* isn't binding authority on the Harvey County court, it is binding on this court.  When our Circuit "'has

rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit . . . unless an intervening decision of the state's highest court has resolved the issue.'" *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)).  Plaintiff cites no intervening, contrary authority from the Kansas Supreme Court.  The court thus grants summary judgment against the blacklisting claim in Count VI.

One last request by plaintiff deserves a brief response.  Plaintiff has filed a motion asking the court to certify this question of law—whether "the Blacklisting statutes require evidence of a criminal conviction"—to the Kansas Supreme Court.  Doc. 100 at 3.  The legal standard governing such requests assigns this decision to this court's discretion.  *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988) (citations omitted).  Because the Circuit has decided this issue directly, the court, exercising its discretion, declines plaintiff's request to certify the issue to the Kansas Supreme Court.

## IV.    Conclusion

For reasons explained by this Order, the court grants defendants' Motion for Summary Judgment (Doc. 78).  The court directs the Clerk to enter Judgment in defendants' favor on all of plaintiff's claims and close the case.  The court also denies plaintiff's Motion to Certify Questions of Law to Kansas Supreme Court (Doc. 100).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 78) is granted.

**AND, IT IS FURTHER ORDERED THAT** plaintiff's Motion to Certify Questions of Law to Kansas Supreme Court (Doc. 100) is denied.

**IT IS SO ORDERED.**

**Dated this 28th day of September, 2021, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**

# United States District Court

-------------------------- DISTRICT OF KANSAS----------------------------

WENDY L. PAINTER,

        **Plaintiff,**

v.                                     **Case No. 19-2336-DDC**

MIDWEST HEALTH, INC.,
PIONEER RIDGE NURSING
FACILITY OPERATIONS, LLC
d/b/a Pioneer Ridge Health & Rehab,

        **Defendants.**

## JUDGMENT IN A CIVIL CASE

☐    Jury Verdict.   This action came before the Court for a jury trial.  The issues have been tried and the jury has rendered its verdict.

☒    Decision by the Court.  This action came before the Court.  The issues have been considered and a decision has been rendered.

**Plaintiff recovers nothing, the action is dismissed on the merits, and the defendants shall recover costs from plaintiff consistent with the Memorandum and Order (Doc. 101) filed on September 28, 2021.**

     09/28/2021                             SKYLER B. O'HARA
         Date                                CLERK OF THE DISTRICT COURT

                                          by:    s/ Megan Garrett          
                                                Deputy Clerk